**Marie Joseph Franco BOULLE and
Lesa Schmidt, Appellants,**

v.

**Jean–Raymond BOULLE, Appellee.**

**No. 05–03–00417–CV.**

Court of Appeals of Texas,
Dallas.

Feb. 25, 2005.

Rehearing Overruled April 26, 2005.

Justin McKenzie Waggoner, Larry R. Veselka, Smyser, Kaplan & Veselka, L.L.P., Houston, Rod Phelan, Baker & Botts, L.L.P., Dallas, for appellants.

Joel J. Steed, Steed Flagg, LLP, Rockwall, Edward Wayne Malouf, Law Office of Edward Wayne Malouf, P.C., Dallas, for appellee.

Before Justices MORRIS, FITZGERALD, and FRANCIS.

## OPINION

Opinion by Justice FITZGERALD.

Appellant Marie Joseph Franco Boulle ("Franco") brings five issues, challenging the summary judgment entered against him and in favor of his brother, appellee Jean–Raymond Boulle ("Jean").[1] We conclude the trial court incorrectly granted summary judgment on Franco's breach of contract, fraud, and rescission claims. Accordingly, we reverse the trial court's judgment on those claims and remand them for further proceedings. In all other respects, we affirm the trial court's judgment.

### BACKGROUND[2]

Franco and Jean carried on related and independent business dealings—largely in the diamond mining industry—for a number of years. Their business relationship included activities conducted by the Boulle Group and the Boulle Partnership. The Boulle Partnership, in turn, carried on some of its activities through a corporation, Exdiam, which the Boulle Partnership formed with other investors. Exdiam entered into a joint venture named Arkansas Diamond Development Corporation ("ADDC"), which held bidding rights on the Crater of Diamonds State Park in Arkansas in the event the park was ever opened for commercial development. One of Exdiam's joint venturers was a subsidiary of Sunshine Mining Company ("Sunshine"). During the same time period, the Boulle Group entered into a different joint venture with Sunshine itself; this venture attempted to acquire a diamond mine in Sierra Leone, Africa. A dispute arose between the Boulles and Sunshine, and litigation ensued. The Boulles received a favorable judgment and settled the case. The parties' settlement included Sunshine's conveying its interest in ADDC to the Boulle Group.

During the course of the Sunshine litigation, the Boulle brothers experienced a falling out. Jean sent Franco a letter dated August 20, 1991, confirming that

---

1. Appellant Lesa Schmidt is Franco's assignee. Accordingly, her rights are derivative of his and will not be discussed separately in this opinion.

2. Because this appeal involves a summary judgment, our recitation of the facts includes undisputed facts and the nonmovant's version of the disputed facts.

"any existing partnership" between the brothers had been "dissolved" on January 1, 1991. Because of the pending litigation, it was not until April 1992 that the brothers turned in earnest to winding up the partnership. During that month, they entered into a series of agreements that purported to divide debts, indemnify each other, and create a plan for the payment and division of the settlement they had jointly received following the Sunshine litigation.

On June 22, 1992, the brothers executed the agreement (the "Agreement") that forms the basis of this lawsuit and appeal. The Agreement stated its purpose as "the separation of the interests in projects in which [the brothers] have been jointly involved as members of the former Boulle Group and as partners in the former Boulle Partnership, both of which have been dissolved." Pursuant to the Agreement, Franco promised to convey any interest he might have in (1) Boulle Partnership projects, (2) some twelve specifically listed "projects," and (3) any other entity he owned jointly with Jean. The specific list of projects included both Exdiam and ADDC. Jean promised in return to pay Franco $45,000 and to assume all of Franco's liabilities related to these various projects. The Agreement included a number of specific provisions related to various creditors, a non-compete provision, and a confidentiality agreement. The provision central to this case reads:

5. Jean Boulle will assign to Franco Boulle a five percent (5%) interest in the net revenues received by Jean Boulle from the projects in which Franco Boulle transfers his interest

to Jean Boulle under this agreement, with a maximum of $5,000,000 to be paid pursuant to this provision.[3]

Jean paid Franco the $45,000 and assumed Franco's liabilities; Jean never assigned Franco any interest under paragraph 5 (the "five-percent provision").

After execution of the Agreement, Jean transferred approximately 85% of the partnership's former interest in ADDC to a corporation he owned named Diamond Mining Company of America ("DMCA"). Another company Jean owned, Maria Investment Limited ("MIL") held the stock of DMCA.

Then, in February 1993, MIL conveyed its DMCA stock to a publicly traded Canadian company named Rutherford Ventures, Inc., which was later re-named Diamond Fields Resources, Inc. ("DFR"). Jean and a colleague named Robert Friedland had acquired DFR earlier in 1993. Jean and DFR entered into a written agreement on February 18, 1993, whereby Jean effectively conveyed DMCA, three Arkansas mining leases, and a Minnesota mining lease to DFR in return for shares of DFR.[4] In the same year, DFR purchased a diamond lease in Africa named the Luderitz Sea Diamond Concession. DFR raised money and continued acquiring new mining interests. One of these interests was a Canadian property named Voisey's Bay, where developers found not diamonds, but a significant deposit of the mineral nickel. Through these years, the value of DFR's stock increased as its as-

---

3. This provision continues: "Jean Boulle confirms that he will execute a more formal assignment agreement with terms and provisions reflecting this agreement if requested by either party to this Agreement." We find no such request for a second assignment agreement in the record.

4. The brothers disagree concerning how many DFR shares Jean received as a result of the February 1993 agreement, but there is no question he received at least 200 shares as consideration for his interest in the former partnership assets.

sets became more valuable. In 1996, Jean and Friedland arranged a conveyance of the nickel deposit to a large Canadian mining company for approximately $3.7 billion. Jean received stock in the mining company valued at more than $250 million.

On February 18, 1998, Franco brought this suit seeking what he claimed was his percentage of Jean's net revenues from that conveyance. Franco pleaded claims for breach of contract, fraud, rescission, breach of fiduciary duty, and a partnership accounting. Jean filed a motion for summary judgment and—after Franco repleaded—a Supplemental Motion for Summary Judgment (together, the "Motion"). The trial court granted the Motion and rendered judgment that Franco take nothing by his claims.

Franco raises five issues on appeal. The first two issues ask whether the summary judgment record raises a fact issue as to Franco's claims of breach of contract and fraud. The third issue asks whether Franco sued for breach of contract, fraud, and an accounting within the four-year limitations period for each of those claims. The fourth issue asks whether Franco is entitled to elect the remedy of rescission. And the fifth issue asks whether the trial court properly granted summary judgment in the face of Jean's purported discovery abuse. Given this formulation of the issues, our review of the summary judgment proceeding will address only the three substantive claims identified above: breach of contract, fraud, and accounting.[5] Finally, we address Jean's attempt to raise as a cross point the trial court's refusal to disqualify one of Franco's law firms.

## SUMMARY JUDGMENT STANDARDS OF REVIEW

A defendant moving for summary judgment must either (1) disprove at least one element of the plaintiff's theory of recovery, or (2) plead and conclusively establish each essential element of an affirmative defense. *City of Houston v. Clear Creek Basin Auth.*, 589 S.W.2d 671, 678–79 (Tex. 1979); *Zep Mfg. Co. v. Harthcock*, 824 S.W.2d 654, 657 (Tex.App.-Dallas 1992, no writ). Jean's Motion attempted to meet both standards by attacking elements of Franco's claims and by attempting to establish the bar of limitations.

Jean's Motion also included both traditional grounds and no-evidence grounds. We review both types of motion under well-settled standards. In a traditional motion, the party moving for summary judgment has the burden of showing there is no genuine issue of material fact exists and that it is entitled to judgment as a matter of law. Tex.R. Civ. P. 166a(c); *Swilley v. Hughes*, 488 S.W.2d 64, 67 (Tex. 1972). A traditional movant has the burden of proving all essential elements of its cause of action or defense as a matter of law. *Black v. Victoria Lloyds Ins. Co.*, 797 S.W.2d 20, 27 (Tex.1990). By contrast, when a party moves for summary judgment under rule 166a(i), asserting that no evidence exists as to one or more elements of a claim on which the nonmovant would have the burden of proof at trial, the burden is on the nonmovant to present enough evidence to raise a genuine issue of material fact on each of the challenged elements. Tex.R. Civ. P. 166a(i); *Gen. Mills Rest., Inc. v. Tex. Wings, Inc.*, 12 S.W.3d 827, 832 (Tex.App.-Dallas 2000, no pet.). If the nonmovant fails to do so, the trial judge must grant the motion. *Id.*

When, as in this case, the trial judge grants summary judgment without specify-

---

**5.** Because the summary judgment on Franco's breach of fiduciary duty claim was not appealed, that judgment is final.

ing the basis for his ruling, we affirm the judgment if any of the movant's theories are meritorious. *Rogers v. Ricane Enter., Inc.*, 772 S.W.2d 76, 79 (Tex.1989).

## BREACH OF CONTRACT

The Motion sought summary judgment on Franco's breach of contract claim on a number of grounds. First, Jean challenged various elements of Franco's claim. Jean argued that Franco never owned— and hence could not transfer—an interest in most of the projects at issue. Moreover, according to Jean, the single project Franco did have an interest in, i.e., ADDC, never generated any "net revenue" within the meaning of the five-percent provision. Indeed, Jean argued *none* of the projects had created net revenue so as to trigger a duty to pay Franco, so Jean could not have breached the Agreement. Second, Jean's Motion set forth the defensive argument of limitations. Jean argued that, if the five-percent provision were intended to include receipts realized from the sale or other transfer of a project, then Franco's claim was barred by limitations because Jean had transferred his interest in the relevant projects more than four years before this lawsuit was filed.

The resolution of each of these issues begins with the same overarching question: what were the parties' rights and obligations under the five-percent provision of their Agreement?

### The Breach of Contract Claim

■ When we construe a written contract, our primary concern is to ascertain the intentions of the parties as expressed in the instrument. *J.M. Davidson, Inc. v. Webster*, 128 S.W.3d 223, 229 (Tex.2003).

As we approach the five-percent provision, however, those intentions are less than clear. At the outset, the parties disagree as to the meaning of the fundamental term "revenue." Jean equates "revenue" with production. He takes the position that his obligation under the five-percent provision was to pay Franco a share of any actual production from the projects transferred and, because there had been no actual production from any of the projects, he never incurred a duty to pay. Franco argues that the five-percent provision contemplates not only funds generated by actual production, but also receipts generated by the sale or other transfer of a project. We cannot say—when we look at the provision and the Agreement as a whole—that either of these interpretations of the meaning of "revenue" is unreasonable. Indeed, Franco argues in the alternative that the Agreement may be ambiguous.[6]

The meaning of the term "revenue" is further complicated by the fact that the provision is triggered by Jean's receipt of "net revenue." Does this provision require Jean to make a profit on the transfer of Franco's interest in a project? Or does "net" in this context mean whatever remains after reconciling costs? The former (a profit) is always a positive number, but the latter (a post-reconciliation remainder) could be a positive or negative number, as in an individual's "net worth." Again, we cannot say that either meaning is unreasonable.

Finally, the parties proffer significantly different views of when, if ever, Jean "received" net revenue, triggering a corresponding obligation to pay Franco's percentage. Jean argues that the partnership

---

**6.** Franco's First Supplemental Petition set forth these alternative theories of interpretation of the Agreement: either the parties intended Franco's understanding of the five-percent provision or the provision is ambiguous and Franco's understanding is one reasonable interpretation of the provision.

projects were transferred for value on February 18, 1993, when he initially traded them for shares of DFR. Franco posits that, because Jean exercised significant control over DFR, the transfer of partnership assets for shares of DFR was not a revenue-generating transfer within the meaning of the Agreement. Indeed, Franco argues the initial DFR transfer "was analogous to Jean moving money from one pocket to another." Franco, for his part, argues no income was realized until Jean sold his DFR stock for $250 million dollars in 1996. This conclusion is supported by Franco's expert's opinion that Jean's obligation to pay was not triggered until Jean received "cash or cash equivalent" for the projects transferred by Franco pursuant to the Agreement.

 Each of these terms of the provision is critical to discerning the parties' rights and obligations under the Agreement. If we can assign the terms of an agreement "a definite or certain legal meaning," then the agreement is unambiguous. *J.M. Davidson*, 128 S.W.3d at 229. However, if the terms of an agreement are subject to two or more reasonable interpretations, then the agreement is ambiguous, and a fact issue is created as to the parties' intent. *Id.* Determining whether a contract is ambiguous is a question of law for the court. *Coker v. Coker*, 650 S.W.2d 391, 394 (Tex.1983). We conclude that the terms "revenue," "net revenue," and "received" as used in the Agreement are subject to more than one reasonable interpretations. The five-percent provision as a whole is subject to a number of different reasonable interpretations, depending on the meaning assigned to those terms. Accordingly, we are unable to discern, as a matter of law, what the parties intended their respective rights and obligations to be under the five-percent provision. The five-percent provision of the Agreement is

ambiguous. *See J.M. Davidson*, 128 S.W.3d at 229.

We conclude that fact issues are raised as to the rights and obligations of the parties pursuant to the five-percent provision of their Agreement. Accordingly, we resolve Franco's first issue in his favor.

### *Limitations as Defense to Breach of Contract Claim*

 Jean also moved for summary judgment on Franco's breach of contract claim on limitations grounds, and Franco's third issue asks whether he has raised a fact issue as to whether he sued on that claim within four years of Jean's breach. A defendant moving for summary judgment on the affirmative defense of limitations has the burden to establish that defense conclusively. *Velsicol Chem. Corp. v. Winograd*, 956 S.W.2d 529, 530 (Tex. 1997). Here, Jean had the burden to establish that Franco's breach of contract claim accrued more than four years before Franco filed suit on February 18, 1998. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 16.004(a)(3). Generally, a cause of action accrues when a wrongful act causes some legal injury, even if the fact of injury is not discovered until later, and even if all resulting damages have not yet occurred. *Murphy v. Campbell*, 964 S.W.2d 265, 270 (Tex.1997). According to this general rule, Franco's breach of contract claim accrued when Jean first failed to pay him five percent of the net revenue from a relevant project. But as we discussed above, the terms of the five-percent provision are ambiguous as to whether and when Franco was entitled to payment and whether and when Jean was obligated to pay.

 When a cause of action accrues is generally a question of law, not fact. *Holy Cross Church of God in Christ v. Wolf*, 44 S.W.3d 562, 567 (Tex.2001). But we cannot resolve the question of accrual when

Franco's rights and Jean's obligations under the five-percent provision are ambiguous. Accordingly, Jean cannot prevail on his summary judgment motion on the breach of contract claim on limitations grounds. We decide the portion of Franco's third issue that relates to his breach of contract claim in his favor as well.

We conclude the trial court erroneously granted summary judgment that Franco take nothing on his breach of contract claim. We reverse that portion of the court's judgment and remand the contract claim for further proceedings.

### FRAUD

The Motion sought summary judgment on Franco's claim that Jean fraudulently induced Franco to enter into the Agreement when he (Jean) had no intention of performing under the five-percent provision. Generally, a fraud cause of action requires: (1) a material misrepresentation, (2) that was either known to be false when made or was asserted without knowledge of its truth, (3) which was intended to be acted upon, (4) which was relied upon, and (5) which caused injury. *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 242 (Tex.2001) (per curiam). The no-evidence portion of the Motion challenged Franco to come forward with evidence on each of these elements except reliance. The traditional portion of the Motion argued the fraud claim was inappropriate because it was based "solely on and dependent upon proof of the breach of contract claim." Finally, Jean argued the fraud claim was also barred by the statute of limitations.

### *The Fraud Claim*

Franco's brief identifies the allegedly false statement on which he relies for his fraud claim: "Jean's promise to pay Franco 5% of the profit he made on account of the partnership assets Franco transferred to him pursuant to the Agreement." Thus, Franco's fraud claim is limited—just as his breach-of-contract claim is limited—to the five-percent paragraph of the Agreement. We have concluded this provision is ambiguous and that we cannot define the parties' rights and obligations under the provision as a matter of law. Accordingly, we cannot begin to determine the most fundamental question in the fraud case: whether a false statement was made in reference to the provision. The fraud claim cannot be resolved as a matter of law at this time. We decide Franco's second issue in his favor.

### *Limitations as Defense to Fraud Claim*

Actions for fraud must be brought within four years of the injury. TEX. CIV. PRAC. & REM.CODE ANN. § 16.004(a)(4). We conclude Franco's fraud claim accrued, as his breach of contract claim did, when Jean first failed to pay him five percent of the net revenue that may have been due from a relevant project. However, as we concluded in the breach-of-contract discussion above, ambiguity in the five-percent provision of the Agreement prevents our determining whether and when such an obligation arose. We conclude, therefore, that the trial court erroneously granted summary judgment on Franco's fraud claim on limitations grounds. We decide Franco's third issue, insofar as it related to his fraud claim, in his favor.

We conclude the trial court erroneously granted summary judgment that Franco take nothing on his fraud claim. We reverse that portion of the court's judgment and remand the fraud claim for further proceedings as well.

### PARTNERSHIP ACCOUNTING

Franco's third issue also challenges the judgment insofar as it concludes

that his claim for a partnership accounting is barred by limitations. Any partner has the right to a formal accounting as to partnership affairs when the circumstances render it just and reasonable. TUPA § 22(d), 1961 Tex. Gen. Laws at 295. The right to an accounting accrues to a partner as against the winding up partner at the date of dissolution if there is no agreement to the contrary. *Id.* § 43, 1961 Tex. Gen. Laws at 303. Franco argues the June 22, 1992 Agreement is "clearly an agreement to the contrary," within the meaning of the statute. We disagree. The Agreement neither mentions nor implies an agreement concerning accounting. We will not imply an agreement to allow an accounting for an indefinite period of time when the record contains no evidence of such an agreement.

A defendant moving for summary judgment on the affirmative defense of limitations has the burden to establish that defense conclusively. *Velsicol Chem. Corp.,* 956 S.W.2d at 530. The statute of limitations for a partnership accounting is four years. TEX. CIV. PRAC. & REM.CODE § 16.004(c). Franco's right to an accounting from Jean accrued on January 1, 1991. Accordingly, Franco's claim for an accounting is time-barred. The trial court correctly granted summary judgment on this ground.

Franco's third issue, insofar as it relates to his accounting claim, is not well taken, and we decide it against him.

## RESCISSION

■■■ Franco sought rescission as a remedy for Jean's alleged breach of contract and tortious conduct. His fourth appellate issue asks whether he is entitled to elect that remedy. Rescission of a contract is available as an alternative to dam-

ages in cases in which one contracting party is induced to contract by the fraud of the other. *Bank One, Tex. N.A. v. Stewart,* 967 S.W.2d 419, 455 (Tex.App.-Houston [14th Dist.] 1998, pet. denied). But we have concluded that Franco's fraud claim cannot be resolved as a matter of law at this time. Likewise, a proposed remedy for that claim cannot be resolved in this appeal. Accordingly, we remand this question to the trial court as well.

## DISCOVERY ABUSE

■■■ Franco details allegations of discovery abuse by Jean and, in his fifth issue, declares that the trial court should not have granted summary judgment in Jean's favor in the face of this abuse. Franco cites to no authority supporting this proposition. Consequently, his argument is inadequately briefed and presents nothing for review. TEX.R.APP. P. 38.1(h); *see also McIntyre v. Wilson,* 50 S.W.3d 674, 682 (Tex.App.-Dallas 2001, pet. denied). We decide Franco's fifth issue against him.

## JEAN'S CROSS-POINT

■■■ Finally, Jean attempts to bring a cross-point before this Court. He complains of the trial court's denial of his motion to disqualify one law firm representing Franco in this case.[7] However, Jean did not file a notice of appeal or attempt to make a showing of "just cause" that would excuse his failure to do so. Jean has waived this complaint. *See Richardson Indep. Sch. Dist. v. GE Capital Corp.,* 58 S.W.3d 290, 292 (Tex.App.-Dallas 2001, no pet.). We cannot grant him any relief greater than the relief the trial court

---

7. Jean also complains of, but does not brief, the trial court's denial of his objection to some of Franco's summary judgment evidence. This unbriefed issue is not before us for consideration.

granted him. *See* TEX.R.APP. P. 25.1(c). We dismiss Jean's cross-point.[8]

## CONCLUSION

We reverse the trial court's summary judgment on Franco's breach of contract and fraud claims, including his request for the remedy of rescission. We remand those claims for further proceedings. In all other respects, we affirm the judgment of the trial court.

---

**8.** Franco has filed a Motion to Dismiss the Cross–Appeal in this Court. By order issued this day, we deny the motion as moot.