*Court Of Appeals*
*Fourth Court of Appeals District of Texas*
*San Antonio*



# OPINION

No. 04-08-00602-CV

**IN THE INTEREST OF S.M.D.**, a Child

From the 225th Judicial District Court, Bexar County, Texas
Trial Court No. 2005-EM5-04645
Honorable Peter A. Sakai, Judge Presiding[1]

Opinion by:     Steven C. Hilbig, Justice

Sitting:         Catherine Stone, Chief Justice
                Phylis J. Speedlin, Justice
                Steven C. Hilbig, Justice

Delivered and Filed: February 24, 2010

AFFIRMED IN PART; REVERSED AND DISMISSED IN PART; REVERSED AND
RENDERED IN PART

      The father of S.M.D. appeals the trial court's order appointing the child's maternal grandmother a possessory conservator and imposing a geographic restriction on S.M.D.'s residence. We hold the grandmother did not have standing to seek conservatorship of S.M.D. and the trial court should not have imposed a geographic restriction.

---

[1] The Honorable Peter A. Sakai presided over trial of the case and signed the judgment. The Honorable Karen Pozza, judge of the 407th Judicial District Court, Bexar County, Texas, presided over the January 18, 2007, hearing on standing and temporary orders.

## PROCEDURAL BACKGROUND

S.M.D. was born to Ed and Nonnie on July 6, 2005. Ed and Nonnie were never married, and their relationship became contentious during the pregnancy and later paternity proceedings. In October 2006, the trial court signed an order designating Ed and Nonnie joint managing conservators, and gave Nonnie the exclusive right to establish S.M.D.'s primary residence. A few weeks after the final order was signed, and before Ed had exercised any possession of S.M.D., S.M.D. and Nonnie traveled to Colorado where, on November 19, 2006, Nonnie disappeared. Soon thereafter, Nonnie's mother, Candice, took S.M.D. to Candice's home in California.

In December 2006, Ed filed a motion to modify, asking to be appointed S.M.D.'s sole managing conservator. In January 2007, Candice filed a petition in intervention, seeking to be appointed joint managing conservator with the exclusive right to determine S.M.D.'s residence and requesting temporary orders. Ed contested the intervention on the ground Candice lacked standing to seek conservatorship of S.M.D. After a hearing, the trial court denied the motion contesting the intervention and named Candice temporary sole managing conservator and Ed temporary possessory conservator. Candice subsequently amended her pleadings, seeking either to be named sole managing conservator or joint managing conservator of S.M.D., or to have grandparental access to and possession of her. Ed unsuccessfully challenged Candice's standing to seek conservatorship of S.M.D. several more times during the subsequent trial court proceedings.

The case was ultimately tried to a jury, which found (1) Ed should be appointed sole managing conservator of S.M.D.; (2) S.M.D.'s residence should be restricted to an area within fifty miles of the Bexar County boundary; (3) S.M.D.'s physical health or emotional well being would

be significantly impaired if Candice were denied reasonable access to or possession of S.M.D.; (4) Candice should be named a possessory conservator; and (5) the amount of attorney's fees reasonably and necessarily incurred by each party. The court signed its final order on July 8, 2008, finding the material allegations in Ed's petition to be true. The court removed Nonnie and Ed as joint managing conservators,[2] appointed Ed sole managing conservator, and appointed Candice a nonparent possessory conservator. Ed was given the exclusive right to designate S.M.D.'s primary residence within the geographic area consisting of Bexar County and extending 50 miles from its boundaries. The court granted Candice standard possession, and awarded Ed his attorney's fees in the amount found by the jury.

Ed timely filed a notice of appeal. On appeal, he argues (1) Candice did not have standing to seek any of the relief she sought or ultimately obtained in this suit; (2) Candice is not entitled to possessory conservatorship, a standard possession order, or some of the rights granted her in the final order; (3) the trial court abused its discretion by imposing a geographic restriction on S.M.D.'s primary residence; (4) to the extent the Texas Family Code confers standing on Candice to intervene to seek conservatorship, possession, or access, without a showing that Ed is an unfit parent, it violates Ed's rights to due process; and (5) the trial court's application of various provisions of the Family Code to grant Candice possessory conservatorship, grant her certain parental rights, and impose a geographic restriction on him, "based solely on the best-interest standard," violates due process and *Troxel v. Granville*, 530 U.S. 57 (2000).

---

[2] Nonnie remained missing at the time this appeal was argued.

### ISSUES RAISED BY CANDICE

Although Candice did not file a notice of appeal, she argues two "counterpoints for just cause" in her appellee's brief: the jury's finding that Ed should be sole managing conservator is "contrary to the great weight and preponderance of the evidence," and the trial court abused its discretion in awarding Ed his attorney's fees.

Rule 25.1(c) of the Texas Rules of Appellate Procedure requires a party seeking to alter the trial court's judgment to file a notice of appeal. An "appellate court may not grant a party who does not file a notice of appeal more favorable relief than did the trial court except for just cause." TEX. R. APP. P. 25.1(c). The rule does not address what circumstances constitute "just cause," and no standard has been developed in the case law. *See Pettus v. Pettus*, 237 S.W.3d 405, 422 (Tex. App.—Fort Worth 2007, pet. denied). Nevertheless, most courts that have addressed the issue suggest the threshold showing that must be made is just cause for failing to file a notice of appeal. *See, e.g., Wagner & Brown, Ltd. v. Horwood*, 58 S.W.3d 732, 737 -738 (Tex. 2001) (rejecting argument that lack of Supreme Court precedent at time notice of appeal was due was just cause for not filing notice of appeal because party's summary judgment motion acknowledged courts of appeals were divided on the issue); *Dwairy v. Lopez*, 243 S.W.3d 710, 714 (Tex. App.—San Antonio 2007, no pet.) (holding no just cause existed to review cross-issue because party failed to bring complaint to trial court's attention in post-judgment motion and had 105 days to file notice of appeal, but failed to do so); *Boulle v. Boulle*, 160 S.W.3d 167, 176 (Tex. App.—Dallas 2005, pet. denied) (declining to consider cross-point because party did not show just cause that would excuse his failure to file notice of appeal); *City of Freeport v. Vandergrifft*, 26 S.W.3d 680, 683 (Tex. App.—Corpus

Christi 2000, pet. denied) (holding court would not consider cross-point because party had "not attempted to show 'just cause' for overlooking her failure to file a notice of appeal"). However, in *Darya, Inc. v. Christian*, 251 S.W.3d 227 (Tex. App.—Dallas 2008, no pet.), the court looked to the merits of the cross-point to decide if there was just cause to consider it, without regard to the reasons for failing to file a notice of appeal. In *Darya*, the court held there was just cause to reverse an award of attorney's fees imposed as sanctions where there was a complete absence of evidence as to the amount of fees reasonably incurred as a result of the appellant's conduct. *Id.* at 232-33.

Candice argues the jury and the trial court incorrectly decided the issues of managing conservatorship and attorney's fees, and that justice requires this court to correct the decisions. Candice has not offered any explanation or cause for failing to file a notice of appeal. Nor did she file a post-judgment motion raising her complaints in the trial court, as was required to preserve her complaint about the factual insufficiency of the evidence to support the jury's finding on managing conservatorship. *See* TEX. R. CIV. P. 324(b)(2). Unlike *Darya*, the issues Candice asks the court to review "for just cause" involve the factual sufficiency of the evidence to support a jury finding and the exercise of the trial court's discretion to award fees, where the trial court had the discretion to do so and the record contains evidence supporting the award. We therefore hold Candice has not shown just cause for granting her more favorable relief than she received in the trial court in the absence of a notice of appeal, and we decline to consider her issues.

### CANDICE'S STANDING TO SEEK CONSERVATORSHIP

Ed argues Candice did not have standing to intervene in the action to seek managing or possessory conservatorship of S.M.D. We agree.

A party seeking conservatorship of a child must have standing to seek such relief. *In re S.S.J.-J.*, 153 S.W.3d 132, 134 (Tex. App.—San Antonio 2004, no pet). "Standing is implicit in the concept of subject matter jurisdiction." *Tex. Ass'n of Bus. v. Tex. Air Control Bd.*, 852 S.W.2d 440, 443 (Tex. 1993). Because "[s]ubject matter jurisdiction is essential to the authority of a court to decide a case," a party's lack of standing deprives the court of subject matter jurisdiction and renders subsequent trial court action void. *Id.*; *In re Smith*, 260 S.W.3d 568, 572 (Tex. App.—Houston [14th Dist.] 2008, orig. proceeding).

When standing has been conferred by statute, the statute itself serves as the proper framework for a standing analysis. *In re Sullivan*, 157 S.W.3d 911, 915 (Tex. App.—Houston [14th Dist.] 2005, orig. proceeding [mand. denied]); *Smith*, 260 S.W.3d at 572. In the context of a suit affecting the parent-child relationship, standing is governed by the Texas Family Code, and "[t]he party seeking relief must allege and establish standing within the parameters of the language used in the statute." *In re H.G.*, 267 S.W.3d 120, 124 (Tex. App.—San Antonio 2008, pet. denied). When standing has been sufficiently alleged in the pleadings, and the jurisdictional challenge attacks the existence of jurisdictional facts, the trial court considers the evidence submitted by the parties to resolve the jurisdictional issues raised. *Bland Indep. Sch. Dist. v. Blue*, 34 S.W.3d 547, 555 (Tex. 2000). The burden of proof on the issue of standing is on the party asserting standing. *In re Pringle*, 862 S.W.2d 722, 725 (Tex. App.—Tyler 1993, no writ). In a family law case, when the petitioner is statutorily required to establish standing with "satisfactory proof," the evidentiary standard is a preponderance of the evidence. *In re A.M.S.*, 277 S.W.3d 92, 96 (Tex. App.—Texarkana 2009, no pet.); *Von Behren v. Von Behren*, 800 S.W.2d 919, 921 (Tex. App.—San Antonio 1990, writ denied). The

petitioner must show the facts establishing standing existed at the time suit was filed in the trial court. *M.D. Anderson Cancer Ctr. v. Novak*, 52 S.W.3d 704, 708 (Tex. 2001); *In re Vogel*, 261 S.W.3d 917, 921 (Tex. App.—Houston [14th Dist.] 2008, orig. proceeding). If the petitioner fails to meet his burden, the trial court must dismiss the suit. *In re M.T.C.*, No. 06-08-00145-CV, 2009 WL 3401123, at *4 (Tex. App.—Texarkana Oct. 23, 2009, no pet.).

A party's standing to seek relief is a question of law we review *de novo.* *Tex. Dep't of Transp. v. City of Sunset Valley*, 146 S.W.3d 637, 646 (Tex. 2004); *S.S.J.-J.*, 153 S.W.3d at 134. When, as in this case, the trial court does not make separate findings of fact and conclusions of law, we imply the findings necessary to support the judgment. *Worford v. Stamper*, 801 S.W.2d 108, 109 (Tex. 1990). We review the entire record to determine if the trial court's implied findings are supported by any evidence. *Waco Indep. Sch. Dist. v. Givson*, 22 S.W.3d 849, 853 (Tex. 2000); *Vogel*, 261 S.W.3d at 921-22.

Standing to file a petition seeking conservatorship of a child is governed by sections 102.003 and 102.004 of the Texas Family Code. Candice does not contend she had standing under any of the provisions of section 102.003, and relies solely on section 102.004. That section provides:

§ **102.004. Standing for Grandparent or Other Person**

(a) In addition to the general standing to file suit provided by Section 102.003, a grandparent, or another relative of the child related within the third degree by consanguinity, may file an original suit requesting managing conservatorship if there is satisfactory proof to the court that:

> (1) the order requested is necessary because the child's present circumstances would significantly impair the child's physical health or emotional development; or

(2) both parents, the surviving parent, or the managing conservator or custodian either filed the petition or consented to the suit.

(b) An original suit requesting possessory conservatorship may not be filed by a grandparent or other person.  However, the court may grant a grandparent or other person deemed by the court to have had substantial past contact with the child leave to intervene in a pending suit filed by a person authorized to do so under this subchapter if there is satisfactory proof to the court that appointment of a parent as a sole managing conservator or both parents as joint managing conservators would significantly impair the child's physical health or emotional development.

(c) Possession of or access to a child by a grandparent is governed by the standards established by Chapter 153.

TEX. FAM. CODE ANN. § 102.004 (Vernon 2008).

### *Section 102.004(a)(2) – Consent*

At various times in the trial court and during oral argument on appeal, Candice argued that a special power of attorney Nonnie executed in connection with her military service established Candice's standing to file the petition in intervention.  The special power of attorney authorized Candice to act on Nonnie's behalf in regards to the care of S.M.D..  Candice argued the power of attorney constitutes Nonnie's consent to Candice's petition in intervention within the meaning of section 102.004(a)(2).  However, even if Nonnie effectively consented to the petition in intervention, standing under section 102.004(a)(2) requires the consent or joinder in the petition of *both* parents.  It is undisputed that Ed neither joined the petition in intervention nor consented to it.  *See* TEX. FAM. CODE ANN. § 102.004(a)(2) (requiring that both parents either file the petition or consent to the suit); *In re Cervantes*, No. 10-09-00261-CV, 2009 WL 3766375, at *8 (Tex. App.—Waco Nov. 10, 2009, orig. proceeding) (holding section 102.004(a)(2) "plainly requires the consent of 'both parents.'"); *Interest of A.M.S.*, 277 S.W.3d at 97 (aunt's standing to file suit seeking conservatorship established

by both parents' representations to court that they agreed to aunt's seeking appointment as managing conservator).  Candice did not establish standing under section 102.004(a)(2).

### *Section 102.004(b) – Significant Impairment of Child*

Candice relies primarily on section 102.004(b) of the Family Code, which authorizes the trial court to allow a grandparent to intervene in a pending suit to seek conservatorship under certain circumstances.  *See* TEX. FAM. CODE ANN. 102.004(b).[3]  If Candice met her burden under section 102.004(b), the trial court had discretion to allow her to intervene and seek both managing and possessory conservatorship.  *See In re Hidalgo*, 938 S.W.2d 492, 496 (Tex. App.—Texarkana 1996, no writ).

Candice argues she bears a "relaxed burden" on standing because she sought to intervene in a pending suit rather than file an original suit.  This argument is apparently based on the version of section 102.004(b) in effect before June 2005.  In suits filed before June 18, 2005, a grandparent could establish standing to intervene in a pending suit to seek conservatorship merely by demonstrating she had substantial past contact with the child.  *See* Act of April 6, 1995, 74th Leg., R.S., ch. 20, §1, 1995 Tex. Gen. Laws 113, 125 (amended 2005) (current version at TEX. FAM. CODE ANN. § 102.004(b) (Vernon 2008)).  A number of appellate opinions involving suits filed before the

---

[3] Candice's trial court pleadings cited only section 102.004(a)(1) in support of her standing allegations.  That section authorizes a grandparent to file an original suit seeking managing conservatorship upon a showing that the child's "present circumstances" will significantly impair the child's physical health or emotional development.  TEX. FAM. CODE ANN. § 102.004(a)(1).  However, when the petition in intervention was filed, S.M.D.'s "present circumstances" were living in Candice's home with Candice being her primary caregiver.  *See In re Vogel*, 261 S.W.3d 917, 922 (Tex. App.—Houston [14th Dist.] 2008, orig. proceeding) ("present circumstances" in context of section 102.004(a) means circumstances on date petition is filed).  The arguments and evidence Candice presented in the trial court did not suggest that S.M.D.'s "present circumstances" endangered her; rather Candice argued that naming Ed S.M.D.'s sole managing conservator would significantly impair her physical health or emotional development.  *See and compare* TEX. FAM. CODE ANN. §102.004(a)(1) and §102.004(b).  In their appellate briefs, Candice and Ed agree that Candice's standing to seek managing or possessory conservatorship in this case is governed by section 102.004(b).

2005 amendment refer to this as a "relaxed" standard for intervention and discuss the reasons for such.[4] *See, e.g., Whitworth v. Whitworth*, 222 S.W.3d 616, 621 (Tex. App.—Houston [1st Dist.] 2007, no pet.); *Chavez v. Chavez*, 148 S.W.3d 449, 455-56 (Tex. App.—El Paso, 2004, no pet.).

In 2005, the Texas Legislature significantly increased a grandparent's burden to show standing under section 102.004(b) to intervene in a pending suit to seek conservatorship by adding a requirement that the grandparent show:

> satisfactory proof to the court that appointment of a parent as a sole managing conservator or both parents as joint managing conservators would significantly impair the child's physical health or emotional development.

Act of May 29, 2005, 79th Leg., R.S., ch. 916, § 3 2005 Tex. Gen. Laws 3148, 3149 (effective June 18, 2005) (current version at TEX. FAM. CODE ANN. § 102.004(b) (Vernon 2008)). Thus a grandparent's burden to show standing to intervene in a pending action is no longer "relaxed." In fact, the grandparent must make the same showing to establish standing as a nonparent must make to overcome the presumption that a parent is to be named managing conservator. *See* TEX. FAM. CODE ANN. § 153.131(Vernon 2008) (presuming that appointment of parent(s) as managing conservator(s) is in best interest of child and providing that presumption may be overcome by showing appointment of parent(s) as managing conservator(s) "would significantly impair the child's

---

[4] This burden was "relaxed" when compared to what a grandparent must establish in order to initiate a suit for managing conservatorship. To file an original suit for conservatorship, a grandparent must establish one of the bases in section 102.003 of the Family Code, have consent of both parents pursuant to section 102.004(a)(2), or show that "the child's present circumstances would significantly impair the child's physical health or emotional development." TEX. FAM. CODE ANN. §102.004(a)(1).

physical health or emotional development").[5]  Although section 153.131 concerns the merits of a

custody dispute and section 102.004(b) concerns standing, we find the caselaw construing section

153.131 instructive because the legislature used the identical language in its 2005 amendment to the

standing section of the Family Code.  *See In re N.B.B.*, No. 04-06-00342-CV, 2007 WL 3171267,

at *6 (Tex. App.—San Antonio Oct. 31, 2007, no pet.) (mem. op.) (recognizing that proof required

for nonparent to show standing to intervene under section 102.004(b) is same as that required for

nonparent to overcome parental presumption in section 153.131); *see also Robertson v. Odom*, 296

S.W.3d 151, 157 (Tex. App.—Houston [14th Dist.] 2009, no pet.) (holding that when construing a

statutory phrase, court may consider the meaning assigned to the term elsewhere in the act or in

another act of similar nature); *Sheshunoff v. Sheshunoff*, 172 S.W.3d 686, 692 (Tex. App.—Austin

2005, pet. denied) (court should give same meaning to same terms used in other statutory provisions

on the same or similar subjects unless something indicates different meaning was intended); *L &

M-Surco Mfg., Inc. v. Winn Tile Co.*, 580 S.W.2d 920, 926 (Tex. Civ. App.—Tyler 1979, writ

dism'd) (stating "this rule applies with particular force where the meaning of a word as used in one

---

[5] Candice does not recognize that the showing required for standing under section 102.004(b) is the same as that required to overcome the parental presumption in section 153.131.  Citing the Texas Supreme Court's opinion in *In re V.L.K.*, 24 S.W.3d 338, 341 (Tex. 2000), Candice repeatedly states the parental presumption does not apply in a modification proceeding.  With respect to determining the merits of a custody dispute, Candice is correct — a grandparent who has standing to file or intervene in a modification proceeding to seek conservatorship is not required to overcome the parental presumption in order to be named a managing conservator.  However, the grandparent must have standing in order to assert the claim and proceed to the merits.  And, since June 2005, a grandparent who does not have standing under section 102.003 or 102.004(a), must make the same showing as that required to overcome the parental presumption in order to have standing.  *V.L.K.* did not address the issue of standing and was written before the legislature's 2005 amendment of section 102.004(b).  Accordingly, the opinion does not affect our analysis of the standing issue.

act is clear or has been judicially determined, and the same word is subsequently used in another act pertaining to the same subject").

In order to show "that appointment of the parent as managing conservator would significantly impair the child, either physically or emotionally," the nonparent must "offer evidence of specific actions or omissions of the parent that demonstrate an award of custody to the parent would result in physical or emotional harm to the child." *Lewelling v. Lewelling*, 796 S.W.2d 164, 167(Tex. 1990) (construing section 153.131 of the Family Code). To meet this burden, the nonparent must present evidence of "specific, identifiable behavior or conduct of the parent," as shown by "specific acts or omissions," and evidence that such acts or omissions "will probably cause that harm." *Critz v. Critz*, 297 S.W.3d 464, 474 (Tex. App.—Fort Worth 2009, no pet.). The evidence must support a logical inference that the specific, identifiable behavior or conduct will probably result in the child being emotionally impaired or physically harmed. *Whitworth*, 222 S.W.3d at 623. The link "may not be based on evidence which merely raises a surmise or speculation of possible harm." *Id.*; *In re M.W.*, 959 S.W.2d 661, 665 (Tex. App.—Tyler 1997, writ denied). The non-parent's burden is not met by evidence that shows she would be a better custodian of the child or that she has a strong and on-going relationship with the child. *See Critz*, 297 S.W.3d at 474-75; *M.J.G.*, 248 S.W.3d at 760. Further, evidence of past misconduct alone is insufficient. *Critz*, 297 S.W.3d at 475. "If the parent is presently a suitable person to have custody, the fact that there was a time in the past when the parent would not have been a proper person to have such custody is not controlling." *May v. May*, 829 S.W.2d 373, 377 (Tex. App.—Corpus Christi 1992, writ denied ).

Because the trial court did not make any express findings of fact, we imply a finding that when Candice filed her petition in intervention in January 2007, the appointment of Ed as S.M.D.'s sole managing conservator would significantly impair S.M.D.'s physical health or emotional development. Ed argues there is no evidence to support this finding. Candice argues the trial court's implied finding is supported by evidence that: when the petition in intervention was filed, Ed had never held S.M.D. and had no relationship with her; Ed's conduct during Nonnie's pregnancy and the paternity proceedings demonstrated hostility towards Nonnie and the child; Ed had no experience or ability to care for the child; Ed had not financially supported S.M.D.; and in the two months between Nonnie's disappearance and the filing of the petition for intervention, S.M.D. and Candice had developed a very close relationship and S.M.D. would suffer harm if that bond were broken. We will review the record to determine whether there is any evidence to support the implied finding that in January 2007, appointing Ed as S.M.D.'s sole managing conservator would have significantly impaired her physical health or emotional development. Our review of the record includes: the January 18, 2007 hearing on temporary orders and Ed's first challenge to Candice's standing; the reporters records from the paternity action that were introduced into evidence at the January 18 hearing—the March 15, 2006 hearing on temporary orders and the September 21, 2006 final hearing; and the remainder of the record, including the evidence introduced at trial, keeping in mind that Candice's standing must be shown as of January 11, 2007, when she filed her original petition in intervention.

The Evidence

Nonnie and Ed met at a dance lesson in October 2004. Nonnie was a nurse in the Air Force and Ed was twenty years older and a semi-retired self-employed rancher who managed family properties. Although Nonnie had a boyfriend in Denver and visited him regularly, Nonnie and Ed soon started dating. In November 2004, after going out just several times, Nonnie told Ed she was pregnant. Their relationship throughout the pregnancy was "rocky." According to Nonnie, Ed did not believe the child was his and urged her to terminate the pregnancy. According to Ed, Nonnie had told him she was unable to conceive because of a previous accident. As soon as she learned she was pregnant, Nonnie became adamant that Ed marry her and repeatedly issued ultimatums, saying that if he did not marry her, she would take the baby to Colorado and Ed would never see the child. Nonnie also told him that if he did not marry her, his child would be "a bastard." The two attempted several times to forge a relationship, and Nonnie even lived with Ed a short time during her pregnancy. However, they "separated" permanently in June 2005, about a month before S.M.D. was born. According to Ed, the last time the two had a conversation, Nonnie had broken into his home. She verbally abused him and hit him with her fists. Ed called the police, who escorted Nonnie from the property and told her charges would be filed if she returned. S.M.D. was born July 6, 2005. Nonnie sent birth announcements to Ed and members of his family. Many of the announcements were returned unopened. Ed ripped the announcement he received in half, wrote, "it's a bastard child" on the back, and returned it to Nonnie.

A paternity action was filed in August 2005. At the temporary orders hearing, held in March 2006, Ed testified he wanted to raise his daughter. However, he conceded he had not made any effort

to see S.M.D. He testified this was because he could not communicate with Nonnie and could not "deal with" her. Ed testified Nonnie was unable to exercise any self control and it would not be in S.M.D.'s best interest for Ed and Nonnie to have regular dealings with each other. At the conclusion of the hearing, the trial court set child support at $900.00 a month and granted Ed standard visitation. He further ordered that if Ed exercised his visitation, the amount of support would be reduced to $600.00. After the court ruled, Ed inquired whether visitation could be facilitated by a third party, and the court indicated that was possible. Although the trial court instructed the attorneys to prepare an order reflecting his rulings, no temporary order was ever signed. However, at a subsequent hearing, the trial court ordered the parties to set up visitation through Kid's Exchange. Ed went to Kid's Exchange, completed the intake, paid the fee, and signed a contract. He anticipated having three weekend visitation days before the final hearing. However, Nonnie did not complete an intake at Kid's Exchange, thus preventing any visitation. Therefore, at the time of the final hearing, Ed had still not spent any time with S.M.D.

The final hearing in the paternity action took place on September 21, 2006. Ed testified he wanted a role in raising his daughter and asked the court to allow him to have custody every other week. He testified he wanted S.M.D. to spend time with his family. He told the court he has a large family with many nieces and nephews. He testified he spent a significant amount of time with the young children in his family and knew how to care for them. Ed also testified he had been married previously, and helped raise his stepson. Ed explained that he had tried to visit with S.M.D. after the trial court ordered visitation facilitated through Kid's Exchange, but was unable to because

Nonnie did not do her part. He expressed his belief that, regardless of what the court ordered, Nonnie was not going to allow him to see the child.

Nonnie testified she had not understood she was required to do an intake at Kid's Exchange before Ed could exercise his visitation. She testified she believed Ed should be awarded standard visitation "[i]f ... his intent is actually to be a father." However, Nonnie stated she was somewhat concerned that Ed's motive for wanting to see S.M.D. was simply to reduce the amount of child support he would be required to pay. She was also concerned that Ed might show to S.M.D. some of the anger and resentment he felt towards Nonnie. Nonnie also testified that before Ed exercised visitation, she wanted to make sure his house was safe and to make sure Ed knew how to change a diaper and to provide proper care.

At the conclusion of the hearing, the trial court named Nonnie and Ed joint managing conservators of S.M.D., with Nonnie having the right to designate S.M.D.'s primary residence and granted Ed standard visitation. However, because Ed did not yet have a relationship with the child, the court ordered twelve hours visitation at Kid's Exchange before starting standard visitation. The court set child support at $900.00 a month and made an arrearage award. After the hearing, but before the final order was signed, Nonnie completed the Kid's Exchange intake. However, when Kid's Exchange personnel contacted Ed about completing additional intake for supervised visitation, Ed balked at having the visits supervised and did not complete the paperwork. The final order, signed October 10, 2006, required the twelve hours of visitation at Kid's Exchange be supervised.

The following month, Nonnie took S.M.D. to Colorado, and Nonnie disappeared on November 19, 2006. Ed learned of the disappearance when someone contacted him to find out if

he had heard from Nonnie. On November 21, Ed called Nonnie's brother in Colorado, expressed concern for S.M.D., and indicated he wanted to bring her to San Antonio. Ed testified he later spoke with Candice's husband, Kevin, who told Ed to stay in San Antonio and said he and Candice would bring S.M.D. to San Antonio in a few days. After a few days had passed and they had not arrived in San Antonio, Ed called and spoke to Kevin again. Ed testified Kevin told him not to worry, that S.M.D. was fine, that he and Candice wanted to work with him, and they would bring S.M.D. to San Antonio. According to Kevin, he told Ed that it was too early to discuss what would happen to S.M.D., and that they would "eventually" come to San Antonio. Kevin testified they brought S.M.D. for a visit to San Antonio during the Christmas holidays, but they did not contact Ed. Ed did not hear from Nonnie's family, and eventually learned Candice and Kevin had taken S.M.D. to their home in California. Ed filed his motion to modify conservatorship on December 29, 2006. Candice filed her petition in intervention on January 11, 2007.

The trial court heard Candice's motion for temporary orders and Ed's contest to the intervention on January 18, 2007. S.M.D. was then 18 months old. Ed testified he had wanted a relationship with his daughter and, with Nonnie missing, he believed he should raise S.M.D. He testified he had never held S.M.D. and explained the difficulties he had encountered in trying to have visitation with S.M.D. during the paternity proceedings. After the final order was entered, he began to think it simply would not be workable because of "the way [Nonnie] is and the way she had been towards me." Ed testified he had been making the child support payments required by the final order.

Ed testified he lived alone in a house he was renovating. He had prepared a room for S.M.D. He testified he had not yet completed the kitchen, but that he and S.M.D. could live in his mother's house until it was done. Ed testified he had experience with young children. He has a large extended family with many young children who he spent a significant amount of time with. He also helped to raise his stepson from the time he was three years old. Finally, Ed had recently taken parenting classes to further prepare him to care for S.M.D. Ed's grown stepson testified at the hearing that Ed had been an "excellent" father to him and that they continued to have a good relationship. There was nothing in his experience with Ed that would give him concern about Ed being S.M.D.'s primary caregiver. Ed's mother and two of his sisters also testified Ed was very good with young children and about the extensive familial support he would have in raising S.M.D. Finally, Ed testified he had no criminal history, no history of mental illness, and no problem with drugs or alcohol.

At the time of the January 2007 hearing, Candice had had physical possession of S.M.D. for two months. She wanted to continue to be S.M.D.'s primary caregiver, but stated she did not have any reservations about Ed having supervised access to S.M.D. She testified that Nonnie thought highly of Ed and his family and wanted them in S.M.D.'s life. Candice testified that before Ed filed the motion to modify, she had not intended to bring S.M.D. to visit Ed until March or April. She testified she was concerned about S.M.D.'s emotional well-being if Ed became her sole managing conservator because Ed was a stranger to S.M.D.

In a later deposition, Candice testified she believed Ed's dislike of Nonnie and the hostility he displayed during the pregnancy and paternity case demonstrate he does not have any compassion,

does not have the capacity to love S.M.D., and that S.M.D. would be emotionally harmed if Ed raised her. Candice also believed Ed had a violent temper that posed a risk to S.M.D.'s physical health. However, the only evidence she cites as support for this belief is the affidavit she filed with her petition in intervention, in which she stated that Nonnie had told her that at a court appearance in the paternity case, Ed "was so extremely angry and out of control that the Bailiff insisted that he accompany [Nonnie] and her attorney to their vehicles." This allegation is not supported by either of the hearing records from the paternity case, and there was no testimony from any source at any of the hearings or at the trial of this case to substantiate the hearsay. Candice did not offer the affidavit or any other evidence at any of the hearings or the trial to support the contention that Ed is violent or had an uncontrollable temper.

Candice contends she and S.M.D. developed a strong bond during the two months she had been S.M.D.'s caregiver. She believed S.M.D. would be harmed if placed in January 2007 with Ed, someone S.M.D. did not know. She relies heavily on the trial testimony of two psychologists — Dr. Dina Trevino, who was appointed by the trial court in February 2007 to perform a social study and custody evaluation, and Dr. Joann Murphey, a clinical psychologist retained by Candice and her husband to counsel them on parenting issues. By the time the psychologists testified at trial, Candice had been S.M.D.'s temporary sole managing conservator and primary caregiver for over a year. Both psychologists testified that by that time S.M.D. and Candice had formed a significant bond and it would be harmful to S.M.D. if she were not allowed continued access to Candice. However, Dr. Trevino testified she had no concerns about Ed being a fit parent, and recommended Ed be appointed

S.M.D.'s sole managing conservator. Dr. Murphey testified she was not aware of any conduct on the part of Ed that would possibly cause harm to S.M.D.

Both psychologists testified S.M.D. suffered some psychological trauma when her primary caregiver disappeared in November 2006. Dr. Trevino testified that in January 2007, it was "better" to place S.M.D. with Candice because they had previous contacts. Dr. Trevino also testified circumstances for S.M.D. would have been "even better" had Candice allowed Ed to spend time with S.M.D after Nonnie disappeared. However, neither psychologist testified S.M.D. would have suffered physical harm or that her emotional development would have been significantly impaired had Ed been named S.M.D.'s sole managing conservator in January 2007.

<u>Discussion</u>

Candice attempts to paint a picture of Ed in January 2007 as an angry, violent man, who was hostile to S.M.D., who refused to have anything to do with her, who had no idea how to care for a child, and who would significantly impair S.M.D.'s physical health or emotional development were he to have custody of her. This picture is not borne out by the record. Notwithstanding Ed's early hostility toward the idea of having a child, Ed actively sought court-ordered visitation during the paternity proceedings. He argued for a geographic restriction on S.M.D.'s residence because of his fear that Nonnie would take S.M.D. permanently to Denver and he would never see her. No evidence was presented, either in the paternity proceedings or in this case, of any conduct, behaviors, or habits of Ed that would probably cause physical or emotional harm to a child. To the contrary, the evidence demonstrated Ed had previously raised a child with whom he maintained a good

relationship, he spent a significant amount of time around young children and knew how to care for them, and had substantial family support.

The judge who heard the paternity case found Ed wanted a relationship with his daughter and was capable of caring for a child, and named him a joint managing conservator of S.M.D. Four months later, Candice contended that naming Ed sole managing conservator would significantly impair S.M.D.'s physical health or emotional development. However, Candice fails to point to evidence of "specific, identifiable behavior or conduct" of Ed after his appointment as joint managing conservator that would "probably cause that harm." *See Critz*, 297 S.W.3d at 474. Candice's argument in essence is reduced to two facts: in January 2007, Ed had never held S.M.D. and Candice had formed a relationship with S.M.D. in the two months after Nonnie disappeared. However, Candice was required to provide evidence to support a logical inference that naming Ed sole managing conservator in light of these facts would significantly impair S.M.D.'s physical health or emotional development. *See Whitworth*, 222 S.W.3d at 623.

Candice relies on several cases in which a parent's lack of contact with the child was considered in determining whether a non-parent had standing to seek conservatorship. However, in each of the cases she cites, not only had the parent had little or no contact with the child, but there was also evidence of specific, identifiable conduct that would probably cause harm to the child. *See In re Vogel*, 261 S.W.3d at 924-25 (grandparent established standing to seek conservatorship with proof father is a long-term alcoholic, father conceded he could not provide financially for the child, father had removed child from mother's funeral and immediately taken child to a lawyer's office and then left him in the care of non-relatives); *In re N.B.B.*, 2007 WL 3171267, at 1*-*5 (nonparent

established standing to seek conservatorship under section 102.004(b) after children's mother died with evidence father had not received training in care for disabled child, father had six children by four different mothers and was behind on child support payments, father had been physically abusive to mother when children were young, had recently hit disabled child, and other child stated she was afraid of him); *In re Pharis*, No. 12-06-00350-CV, 2006 WL 3735107, at *2 (Tex. App.—Tyler Dec. 20, 2006, orig. proceeding) (mem. op.) (grandparent demonstrated standing to seek conservatorship of week-old child under 102.004(a)(1) with evidence mother expressed no concern about the child's medical condition when released from hospital after birth, disregarded instructions she received at hospital in order to be with her boyfriend, and left child with someone who was unable to care for the child). There is no such evidence in this case.

Nor is the fact that Candice had developed a relationship with S.M.D. during the two months after Nonnie's disappearance dispositive in the absence of evidence that S.M.D.'s emotional development would be significantly impaired if she did not continue living with Candice. *See In re M.J.G.*, 248 S.W.3d at 760. Although Dr. Trevino testified Candice was the "better" choice as a temporary conservator in January 2007, Candice's burden was not met by evidence she "would be a better custodian of the child." *See Lewelling*, 796 S.W.2d at 167. Neither of the psychologists testified S.M.D. would have been significantly impaired had Ed been named her sole managing conservator in January 2007. Candice argues she was not required to produce such evidence because it is "common sense" that harm to S.M.D. would follow. We disagree and hold that on the facts disclosed in this record, Candice raised no more than a surmise or speculation of possible harm.

We hold there is no evidence in the record to support the trial court's implied finding that appointment of Ed to be S.M.D.'s sole managing conservator in January 2007 would have substantially impaired S.M.D.'s physical health or emotional development. Candice failed to meet her burden to show standing under section 102.004 of the Family Code and the trial court should have dismissed her pleadings seeking conservatorship.

### POSSESSION AND ACCESS

Candice pleaded alternatively for grandparental possession and access of S.M.D. pursuant to section 153.432 of the Family Code. *See* TEX. FAM. CODE ANN. art. 153.432 (Vernon Supp. 2009). As a biological grandparent of S.M.D., Candice had standing to seek possession under the statute. *See Smith*, 260 S.W.3d at 572. However, a court order granting possession of or access to a child by a grandparent requires proof that "the grandparent requesting possession of or access to the child is a parent of a parent of the child and that parent of the child: (A) has been incarcerated in jail or prison during the three-month period preceding the filing of the petition; (B) has been found by a court to be incompetent; (C) is dead; or (D) does not have actual or court-ordered possession of or access to the child." TEX. FAM. CODE ANN. art. 153.433 (b) (Vernon Supp. 2009). Candice concedes she did not establish a right to possession and access under the statute. Accordingly, the trial court's order awarding Candice standard possession of S.M.D. cannot be upheld under section 153.432.

## RESIDENCE RESTRICTION

Ed also seeks reversal of the trial court's order restricting S.M.D.'s primary residence to an area within fifty miles of Bexar County. Ed argues the trial court is without authority to impose a geographic residency restriction on a parent sole managing conservator.

All sections of the Family Code that mention a geographic residency restriction concern joint managing conservatorships. *See* TEX. FAM. CODE ANN. §§ 105.002(c)(1)(E); 153.133(a)(1); 153.134(b)(1) (Vernon Supp. 2009). Ed contends the legislature's failure to expressly authorize imposition of a geographic residency restriction on a sole managing conservator precludes the trial court from doing so in the appropriate circumstances. We disagree. *See, e.g., Interest of A.S.*, 298 S.W.3d 834, 836 (Tex. App.—Amarillo 2009, no pet.) (residency restrictions may be imposed upon a sole managing conservator); *Sanchez v. Sanchez*, No. 04-06-00469-CV, 2007 WL 1888343, at *3 (Tex. App.—San Antonio 2007, pet. denied) (stating trial court had discretion to determine scope of residency restriction on sole managing conservator), *cert. denied*, 129 S.Ct. 71 (2008). We perceive the purpose of imposing a geographic residency restriction is to ensure those who have rights to possession of the child are able to effectively exercise such rights. *See A.S.*, 298 S.W.3d at 835 (upholding residence restriction on sole managing conservator because in child's best interest to have frequent and continuing contact with parent possessory conservator). No such purpose is served in this case. As a result of our holdings above, however, there is no person other than Ed with a court-ordered right to possession of S.M.D. Under these circumstances, we hold the restriction unreasonably interferes with Ed's rights as a parent sole managing conservator. We therefore sustain this issue.

**CONCLUSION**

Because Candice lacked standing to seek conservatorship, we reverse the part of the trial court's order that names her a possessory conservator and render judgment dismissing her petition for conservatorship for lack of jurisdiction. We reverse the part of the trial court's order awarding Candice standard possession of S.M.D. and restricting the area of S.M.D.'s primary residence, and render judgment denying the petition for possession and access. In all other respects, the trial court's modification order is affirmed.


Steven C. Hilbig, Justice