# NO. 12-23-00256-CV

# IN THE COURT OF APPEALS

# TWELFTH COURT OF APPEALS DISTRICT

# TYLER, TEXAS

| | | |
|---|---|---|
| *IN RE:* | § | |
| *B.R.,* | § | *ORIGINAL PROCEEDING* |
| *RELATOR* | § | |

## MEMORANDUM OPINION

B.R. filed this original proceeding to challenge Respondent's actions in a suit affecting the parent child relationship.[1]  We conditionally grant the writ.

## BACKGROUND

B.R. (hereafter Mother) is the mother and joint managing conservator of B.J.D.[2]  Real Party in Interest B.D. (hereafter Father) is the father and joint managing conservator of B.J.D. Real Party in Interest J.P. (hereafter Grandmother) is B.J.D.'s maternal grandmother.  B.J.D. previously lived in Giddings, Texas with Mother and Grandmother.  Father also resided in Giddings.  Sometime around 2018, Mother and B.J.D. moved to Palestine, Texas to live with A.O., with whom Mother had and has maintained a romantic relationship.[3]  In May 2022, Respondent signed a ten-year protective order against A.O. in another suit pending in Anderson County, finding that he engaged in family violence and stalking against his former wife, D.O., and is likely to commit family violence in the future.  That September, the Texas Department of Family and Protective Services (the Department) completed an assessment after receiving a

---

[1] Respondent is the Honorable Jeffrey B. Doran, Judge of the County Court at Law in Anderson County, Texas.

[2] In 2014, a Lee County District Court entered an order establishing the parent-child relationship, among other orders.

[3] The Lee County case was transferred to Anderson County in 2021.

report concerning the safety of B.J.D. in Mother's home, but closed the case due to no further concerns related to B.J.D.'s safety.

On January 22, 2023 (over four years after Mother and B.J.D. moved into A.O.'s home), during Father's visitation, B.J.D. told Grandmother she is scared when she has to do "work outs" at A.O.'s home, has to hide when people come over, eats two meals per day, and has been told to go to the other side of the house when A.O. and Mother argue. Father subsequently informed Mother via text message that he would not be returning B.J.D. to Mother at the end of his visitation. On January 24, Grandmother filed a petition to modify suit affecting the parent child relationship (SAPCR) in the case transferred from Lee County in 2021, seeking to be designated B.J.D.'s sole managing conservator or joint managing conservator with the exclusive right to determine B.J.D.'s primary residence. In her supporting affidavit, Grandmother alleged that A.O. is controlling and brainwashed Mother to keep her and B.J.D. away from Mother's family. Grandmother claimed to have become concerned for B.J.D.'s physical safety when she learned of the protective order against A.O. and doubted Mother's ability to protect B.J.D. She believed that appointment of a parent as sole managing conservator or both parents as joint managing conservators would significantly impair B.J.D.'s physical health or emotional development and that B.J.D.'s present circumstances would significantly impair her physical health or emotional development. Mother was never served with Grandmother's motion to modify.

In his supporting affidavit, Father opined that it seems A.O. is controlling and dictates much of Mother's life. Father described an instance during a transfer wherein B.J.D. heard other people in A.O.'s car asking whether they needed to use a knife to hurt Father. When he learned about the protective order, he became concerned for B.J.D.'s and Mother's safety. He admitted needing Grandmother's help to care for B.J.D. and expressed his agreement with Grandmother's suit and request for primary custody. D.O. also provided an affidavit stating that she and A.O. have three children and that a ten-year protective order was entered against A.O. after he stalked D.O. and threatened to kill her in front of their children. In that proceeding, their children were interviewed by the court in chambers and after hearing their testimony, the court issued orders limiting their contact with A.O. D.O. worried about B.J.D.'s safety absent some protections.

On January 26, Mother filed a petition for writ of habeas corpus in which she alleged entitlement to possession of B.J.D. on grounds that Father violated the order by failing to return the child at the end of his possession period. The next day, Respondent informed the parties'

counsel via email that he would not grant either Mother's petition or Grandmother's request for a temporary restraining order. Respondent stated that the parties are expected to obey the operative order until it was modified, and accept the consequences of violating it without legal justification. Presumably in response to Respondent's e-mail, B.J.D. was returned to Mother and both returned to Palestine. On January 30, she and Mother traveled to Giddings. On January 31, Mother returned to Palestine without B.J.D.

On February 2, Respondent began a temporary orders hearing at which Grandmother, Father, and Mother all appeared and participated. On February 6, after the hearing concluded, Respondent emailed the parties his findings that legally sufficient evidence established grounds for Grandmother's intervention and the evidence supported modification. He (1) added Grandmother as a temporary joint managing conservator with the right to designate B.J.D.'s primary residence, (2) enjoined the parties from allowing A.O., his mother, and his brothers, to have contact with B.J.D., or discussing the case with her, and (3) ordered contact and possession times for Mother as long as she could exercise possession without violating the injunction order. It was not until June 20 that Respondent signed a temporary order incorporating these rulings. This original proceeding followed.

## PREREQUISITES TO MANDAMUS

Mandamus is an extraordinary remedy. *In re Sw. Bell Tel. Co., L.P.*, 235 S.W.3d 619, 623 (Tex. 2007) (orig. proceeding). A writ of mandamus will issue only when the relator has no adequate remedy by appeal and the trial court committed a clear abuse of discretion. *In re Cerberus Capital Mgmt., L.P.*, 164 S.W.3d 379, 382 (Tex. 2005) (orig. proceeding). The relator has the burden of establishing both prerequisites. *In re Fitzgerald*, 429 S.W.3d 886, 891 (Tex. App.—Tyler 2014, orig. proceeding.). "Mandamus will not issue when the law provides another plain, adequate, and complete remedy." *In re Tex. Dep't of Family and Protective Servs.*, 210 S.W.3d 609, 613 (Tex. 2006) (orig. proceeding).

A trial court abuses its discretion when it makes a decision that is so arbitrary and unreasonable as to amount to a clear and prejudicial error of law. *In re M-I L.L.C.*, 505 S.W.3d 569, 574 (Tex. 2016) (orig. proceeding). We will not substitute our judgment for that of the trial court but must consider whether the trial court acted without reference to guiding rules and principles. *Id*. A trial court has no discretion in determining what the law is or applying the law

3

to the facts. *Id*. A clear failure by the trial court to correctly analyze or apply the law constitutes an abuse of discretion. *Id*. Mandamus is an appropriate remedy in this case because temporary orders are not subject to interlocutory appeal. *See **In re Derzapf***, 219 S.W.3d 327, 335 (Tex. 2007); *see also **In re Berryman***, 629 S.W.3d 453, 457 (Tex. App.—Tyler 2020, orig. proceeding); TEX. FAM. CODE ANN. § 105.001(e) (West 2023).

## SERVICE

We first address Mother's contention that Respondent abused his discretion by hearing Grandmother's petition to modify, over objection, without Mother having been served with the suit. To support this claim, she cites Section 102.009 of the family code.

Section 102.009 sets forth several parties who are entitled to service of citation on the filing of a petition in an original SAPCR. TEX. FAM. CODE ANN. § 102.009 (West 2023). However, Grandmother filed a petition to modify. Chapter 156 governs modification and provides, "A party whose rights and duties may be affected by a suit for modification is entitled to receive notice by service of citation." *Id*. at § 156.003 (West 2023). As B.J.D.'s mother, Mother was entitled to notice of the modification petition by service of citation. No one appears to dispute that Mother was not formally served.

Nevertheless, "a party's personal appearance before the trial court indicates a submission to the court's jurisdiction, constituting a general appearance and waiving any complaint as to service." *Interest of T.S.*, No. 01-22-00054-CV, 2022 WL 4474277, at *14 (Tex. App.—Houston [1st Dist.] Sept. 27, 2022, no pet.) (mem. op.); *see* TEX. R. CIV. P. 120 (defendant may, in person, by attorney, or by his duly authorized agent, enter appearance in open court; such appearance shall have same force and effect as if citation had been duly issued and served). A party enters a general appearance by (1) invoking the judgment of the court on any question other than the court's jurisdiction, (2) recognizing by her acts that an action is properly pending, or (3) seeking affirmative action from the court. *Exito Electronics Co. v. Trejo*, 142 S.W.3d 302, 304-05 (Tex. 2004) (per curiam); *Interest of S.A.*, No. 12-22-00187-CV, 2022 WL 16558461, at *6 (Tex. App.—Tyler Oct. 31, 2022, no pet.) (mem. op.); *In Interest of D.M.B.*, 467 S.W.3d 100, 103 (Tex. App.—San Antonio 2015, pet. denied).

On January 26, Mother filed her petition for writ of habeas corpus. On January 27, Respondent notified Mother's counsel and Grandmother's counsel via email that he would not be

granting either Grandmother's requested temporary restraining order or Mother's habeas petition. That same day, the court coordinator informed the parties by email, including Mother's counsel, that the case was set for February 2 for a hearing on Grandmother's request for temporary orders. On February 1, Mother's counsel emailed the court coordinator, stating that she and Grandmother's counsel agreed to conduct the hearing via Zoom. She further stated that Mother had not been served with the modification petition and expressed a need for clarification of what was actually set to be heard. In response, Grandmother's counsel expressed her understanding that by agreeing to the hearing, Mother's counsel "accepted service on each other's pleadings as officers of the Court." At the February hearing, the following exchange occurred:

> Mother's Counsel: Your Honor, before we get started, I want to talk to the Court just real briefly about, you know, what's actually being considered today. I don't know if it was your intent for all motions that have been filed to be considered today or only those that have been served or can be heard today. I just wanted to briefly get your take on that before we get started. My client has still not been served with the motion for modification, and once we are served with it, we would be filing a motion to dismiss it for lack of standing. I had believed that we were going to be talking about the habeas today.
>
> Respondent: Well, my understanding was that this was a temporary hearing. Is that not the case?
>
> Mother's Counsel: Your Honor, my client's not been served with the modification.
>
> Respondent: Right.
>
> Mother's Counsel: So I don't know if we can have a temporary hearing today.
>
> …
>
> Grandmother's Counsel: Your Honor, I understood … when we had our telephone conference with you on Friday, I wasn't aware of the writ until we had your email. So when [Mother's counsel] and I and you had a telephone conference, my understanding was that we had all agreed that we were going to be addressing everything pending before you which would have been my request for temporary orders hearing, her request for the writ, which I believe the Court had already stated that the writ was – wouldn't be signed, the TRO wouldn't be signed, and we were going to be taking up this case which was really the temporary orders hearing today as quickly as we could because the Court wanted a hearing, and that's what I thought we were here to deal with today. She had entered her appearance for her client, [Mother.]

Respondent proceeded to discuss whether there is a case to be qualified, during which Mother's counsel addressed Grandmother's standing. Respondent then stated, "Okay. Well, I'll take evidence then on the question of the risk of harm to the child." Respondent asked whether anyone was invoking the Rule, to which Mother's counsel responded, "Yes, Your Honor." The parties proceeded with the hearing, without further objection from Mother.

We conclude that the record reflects Respondent signed the temporary order after a hearing in which Mother made a general appearance. Mother's counsel participated in the

hearing, calling and questioning witnesses, and making objections. By objecting, counsel invoked the judgment of the trial court on a question other than the court's jurisdiction. *See D.M.B.*, 467 S.W.3d at 104 (attorney ad litem's actions, particularly multiple objections to substantive issues, constituted general appearance). Moreover, when Respondent asked Mother's counsel whether she was asking for the child's return that day, she replied, "Yes, Your Honor." In her closing argument, counsel asked that the modification be dismissed for lack of standing and B.J.D. returned home. By seeking dismissal of the case and B.J.D.'s return, Mother sought affirmative relief. *See S.A.*, 2022 WL 16558461, at *6 (A.A., both personally and through court-appointed attorney, entered general appearance and requested affirmative relief by seeking dismissal of case and return of children). Accordingly, Mother entered a general appearance and Respondent did not abuse his discretion by proceeding with the hearing.

## EVIDENCE AT TEMPORARY ORDERS HEARING

At the temporary orders hearing, Respondent heard two versions of what occurred in late January 2023. Bethany Clevenger, Mother's friend, testified that Mother messaged her on January 29 to disclose that she planned to leave A.O., claiming that threats were made and she had to leave to protect B.J.D. Mother told Clevenger that she could not afford for A.O. to know anything until she left, and the protective order involved "something very bad." Mother's written messages with Clevenger support Clevenger's testimony. Mother's aunt, L.V., testified that Mother called her on January 29 to say she was coming home, but had to wait until A.O. was absent to leave.

Grandmother testified that on January 30, she met Mother in Palestine. Grandmother believed Mother intended to leave A.O. because Mother had called her, wanting to come home because she did not feel safe. Mother claimed threats were made by A.O. and his mother, accusing her of being at fault for A.O. losing his children. Grandmother drove her to B.J.D.'s school to retrieve B.J.D. Richard Kyle Taylor, B.J.D.'s school principal, testified that Mother unenrolled B.J.D. on January 30 because she wanted to enroll B.J.D. in another district and wanted B.J.D. to be in a safe place. She claimed to have been in a violent relationship for the last four and a half years. Taylor described Mother as "scared but relieved." Grandmother, L.V., and two of Mother's sisters all testified that when Mother came home, she and B.J.D. appeared relieved and happy. All of them believed Mother was returning home permanently. Text

messages between Mother and others reflect a discussion about B.J.D. collecting her friends' phone numbers before leaving Palestine, and that B.J.D. was happy but would miss her friends. On January 30, Mother texted, "He will be leaving at 7[:]30 in the morning" and "I'll let yall [sic] know when he is gone[.]" She admitted to being nervous but "ready."

But Grandmother testified that on the next day, Mother announced she was returning to Palestine. B.R., one of Mother's sisters (hereafter Sister) testified that B.J.D. began crying; after which Mother considered leaving B.J.D. with her family and returning to Palestine alone. Mother went to Palestine that day, while B.J.D. remained in Giddings. The same day, Robin Williams, an investigator with the Department, spoke to B.J.D. after concerns were raised regarding her home conditions. Williams described B.J.D. as leery, physically shaken, and "kind of upset." B.J.D. indicated she was upset because it was her birthday and she might be unable to celebrate with Grandmother, and she was supposed to stay with Grandmother long-term. B.J.D. stated she did not feel safe at Mother's house because the punishments imposed by A.O. "made her feel like she was hurting and crying." Specifically, A.O. made B.J.D. perform push-ups, sit-ups, and planks until she could no longer continue and began crying, after which he told her to continue. B.J.D. said she could not disclose "other stuff," but alluded to "there possibly being something else." B.J.D. had not seen physical altercations between A.O. and Mother, but overheard verbal altercations. B.J.D. acknowledged having plenty to eat, a place to sleep, and clean clothes, but when asked where she felt safe, she identified Grandmother. B.J.D said she was afraid to be with A.O. and wanted to stay with Grandmother. Taylor testified that on February 2, Mother called him to discuss re-enrolling B.J.D. in Palestine ISD. She stated that she would no longer be moving, believed Grandmother set her up and made her say the things she previously said to Taylor, said B.J.D. is in a safe place, and claimed A.O. is a wonderful father. According to Mother, Grandmother picked her up on January 30 and began making allegations Mother knew nothing about, stating that if Mother did not do what she said (including unenrolling B.J.D. from school), Grandmother would take B.J.D. and have Mother jailed. Mother claimed that her comments to Taylor and Clevenger resulted from Grandmother's threats and prompting. Mother believed B.J.D. was coaxed when talking to Williams because B.J.D. had not said anything when another caseworker came to the house in September 2022. Mother stated that when she told her family she wished to return to Palestine with B.J.D., they became upset.

With respect to her relationship with A.O., Mother testified that they resided in Palestine with his children and B.J.D., but only she, A.O., and B.J.D. currently live in the home. She testified that A.O. is rarely home but is a great father who B.J.D. calls "dad." She testified that she agreed to return to Giddings because she and A.O. had a disagreement, but denied any abuse, threats, or violence toward herself or her children. She did not permit A.O. to discipline B.J.D., and never saw A.O. discipline his own children other than taking away an iPad, talking with them, or giving a time out. She had no intention of leaving A.O., leaving his house, or removing B.J.D. from A.O. Mother denied ever intending to stay in Giddings.

Amanda Barta, Mother's friend, testified that she often socializes with Mother and A.O. She described them as a "loving, very caring family." She testified that A.O. is a caring and loving father and gives the children undivided attention. She never saw him abuse the children or Mother and she believed Mother would confide in her if he did. However, other witnesses (including Grandmother, Clevenger, Sister, and Father) testified that Mother's relationship with A.O. had caused negative changes to her personality and mental state. Neither Grandmother nor Clevenger had ever been to A.O.'s home to witness interactions amongst Mother, B.J.D., and A.O. The only time Sister visited A.O.'s home, she was threatened with a restraining order if she returned. Father testified that it became more difficult for him to see B.J.D. after Mother moved to Palestine to live with A.O. When Father did see B.J.D., A.O. and several other people showed up for visitation exchanges without Mother.

The parties further presented different views of B.J.D.'s characteristics and well-being. According to Mother, B.J.D. is a straight A student, is in gifted and talented, as well as honors classes, and has friends in Palestine. Taylor testified that B.J.D. missed very few days of school, had no behavioral problems, and appeared happy, clean, and properly nourished. L.V. stated that B.J.D. "looks okay," but does not seem happy, although she had never witnessed B.J.D.'s interactions with others or in her home environment in Palestine. Barta testified to having no concerns about B.J.D.'s well-being, and that she is loving, well-behaved, and well-fed. Grandmother, however, testified that B.J.D.'s hair was not cared for, having bald spots from a straightening chemical. Both Grandmother and Father acknowledged submitting no photographs or videos depicting physical abuse or neglect, nor had either of them observed any physical abuse or neglect (other than B.J.D.'s hair). L.V. and Sister likewise denied seeing any signs of

physical abuse to Mother or B.J.D. Grandmother acknowledged that she contacted the Department once, but the Department ruled out any allegations of abuse.

Respondent also heard differing opinions as to whether B.J.D. should be placed with Mother or Grandmother. Mother believed B.J.D. should remain with her. She testified that B.J.D. shares a room with her sister W.B. (Mother's other daughter) during Mother's periods of possession.[4] Mother prepares B.J.D. for school, cooks her meals, takes care of her, washes her clothes, and helps with homework. She also believed it best for B.J.D. to return to school in Palestine. Mother did not believe it was in B.J.D.'s best interest to be placed with Grandmother because she feared Grandmother would treat B.J.D. poorly. According to Mother, she left Giddings because Grandmother is controlling and abusive. Mother described Grandmother slapping her, not permitting her to go anywhere, throwing knives and other items at her father, allowing her father to fall, and choking her sister. She stated that Grandmother's home is not clean, and described the presence of drugs (testifying that her father used methamphetamine, cocaine, and marijuana and was previously convicted in Lee County for drug charges). Mother was afraid that B.J.D. would be unsafe, and could be abused if she failed to obey Grandmother. However, Mother's family disputed this testimony. M.R., another of Mother's sisters, denied that Grandmother is controlling or that Mother seemed afraid of her, that the house is filthy, and that either parent ever abused her or her sisters. Although her father had a previous criminal case, she testified that there was no drug use in the home either in the past or currently. She testified that her father works out of town and is gone a lot. Father described Grandmother's family as "well-knit," denied that Grandmother's home is filthy, and had no concerns with B.J.D. staying there.

Grandmother, Father, L.V., and Sister all believed B.J.D. should be placed with Grandmother. Although Father always had concerns about B.J.D. living with A.O. over the past 4 1/2 years, he became particularly concerned when he heard about the protective order. He opined that returning B.J.D. to Mother places her in danger and would impair her physical and mental well-being, and that Grandmother's conservatorship was necessary to protect B.J.D. Similarly, Grandmother did not believe that B.J.D. could be safe with Mother if she and B.J.D.

---

[4] The record shows that W.B. is the child of Mother and K.B., an individual otherwise unrelated to this matter; it is unclear whether W.B. is older or younger than B.J.D. W.B. is the subject of an ongoing SAPCR in Lee County, and lives primarily with her father, K.B.

are with A.O. Grandmother did not want B.J.D. to be unable to see Mother, but wanted measures in place to protect B.J.D., including restrictions against A.O. She believed that B.J.D.'s physical health or emotional development would be significantly impaired based on current orders. Clevenger believed that Mother loves B.J.D., but was not being a good mother by taking B.J.D. back to the home with A.O. Sister believed that B.J.D. would be significantly impaired living with Mother, but denied having firsthand knowledge on which to base her opinion. L.V. believed that it would be physically and emotionally detrimental for B.J.D. to be with Mother. Williams felt that B.J.D. was safe with Grandmother.

Though A.O. neither testified nor attended the hearing which took place over three days, considerable references were made about the ongoing custody case between A.O. and D.O. and the protective order entered therein on May 22, 2022. Respondent is also presiding over that case, issued the protective order, and has personal knowledge from those proceedings as to A.O.'s actions and conduct toward his children with D.O.

During the hearing, the following occurred regarding the protective order:

> Respondent: But here's the -- have you read the protective order, the file on it?
> Grandmother's Counsel: I have read that. I've read the protective order, Your Honor, not the file.
> Respondent: Sure. The -- I was the Judge in that case.
> …
> Respondent: … I want everyone to understand, I have had multiple cases over six years or seven years involving [A.O.]. I've seen videos. I've interviewed his children multiple times so I have a great deal of information that maybe you guys don't concerning what goes on in that house, and you know what an appropriate response for it is. I just wanted to be clear about that to let everybody know on the record that I have that exposure to [A.O.] and his activities.
> …
> Respondent: … And, again, I do want you to understand I interviewed [A.O.'s] children less than 30 days ago so I know what their take is on the environment and what they say about it. And I want to be clear about that if anyone has a problem with my knowing that -- and there was no record made of that interview…

The protective order was not admitted at the hearing but was included as an exhibit to Grandmother's petition. The record does not show that any party objected to Respondent continuing to preside over the case or to his personal knowledge of other proceedings involving A.O., and Mother does not complain regarding Respondent's impartiality in this proceeding. It appears from the transcript that Respondent attempted to disclose his preexisting knowledge about A.O. and the circumstances in A.O.'s home to provide the parties an opportunity to move for recusal if they had concerns about such knowledge impacting Respondent's ability to preside over B.J.D.'s case (although no party elected to do so). *See* TEX. R. CIV. P. 18b(e) (parties to a

10

proceeding "may waive any ground for recusal after it is fully disclosed on the record."). No transcripts of any testimony in A.O. and D.O.'s case was offered into evidence, and Respondent did not disclose what testimony or evidence, if any, he considered in this case.

At the conclusion of the hearing, Respondent stated that he would meet with B.J.D., who was then ten years old, at 1:30 that day. That afternoon, he sent the parties an e-mail stating that he met with B.J.D. and setting forth his rulings. Respondent described Mother as "vulnerable," recognizing that both sides argued the other was exploiting Mother's vulnerability. Respondent felt that Mother "could use some help developing the tools to deal with this, but she hasn't asked for it and it isn't likely succeed [sic] unless the people around her support and encourage her." The record does not demonstrate the substance of his discussion with B.J.D.

## Evidence Related to Protective Order

We address Mother's argument that Respondent abused his discretion by considering testimony from an unrelated hearing regarding a protective order between individuals who are not parties to the case. Specifically, Mother maintains that the protective order against A.O. was never admitted into evidence at the hearing and, consequently, this Court cannot consider it. Additionally, Mother complains that Respondent considered evidence from the protective order hearing when such hearing was not admitted into evidence at the modification hearing. Grandmother responds, "Any matter involving Relator and the household in which she lives in, the people in which she lives [sic], are relevant to the child's best interests and the physical and emotional safety and well-being of the child."

A trial court may take judicial notice of its own records in a case involving the same subject matter between the same, or practically the same, parties. *In re Shifflet*, 462 S.W.3d 528, 539 (Tex. App.—Houston [1st Dist.] 2015, orig. proceeding) (citing *Gardner v. Martin*, 162 Tex. 156, 158, 345 S.W.2d 274, 276 (1961)). The trial court may take judicial notice of its own records in matters that are generally known, easily proven, and not reasonably disputed. *In re R.S.D.*, 446 S.W.3d 816, 820 n.4 (Tex. App.—San Antonio 2014, no pet.). Specifically, a court may take judicial notice that a pleading has been filed in the case or that it signed an order, but may not take judicial notice of the truth of allegations in its records. *Id*. When the record is silent, the trial court may be presumed to have taken judicial notice of records in its file without any request being made and without an announcement in the record that it did so. *In re J.E.H.*, 384 S.W.3d 864, 869-70 (Tex. App.—San Antonio 2012, no pet.). Accordingly, Respondent

11

could take judicial notice of the protective order because it was filed in the case but could not take judicial notice of the truth of the allegations therein. *See R.S.D.*, 446 S.W.3d at 820 n. 4; *see also J.E.H.*, 384 S.W.3d at 870 (while trial court could properly take judicial notice that it signed order adopting family service plan and what plan listed as necessary requirements, it could not take judicial notice of allegations caseworker made therein). Thus, in conducting our analysis, we will not consider the protective order itself and will only consider any testimony presented at the February hearing regarding the protective order.

With respect to other proceedings before Respondent involving A.O., and specifically Respondent's interviews with A.O.'s children, in order for testimony from a prior hearing or trial to be considered in a subsequent proceeding, the transcript of that testimony must be properly authenticated and entered into evidence. *See, e.g., In re M.C.G.*, 329 S.W.3d 674, 675 (Tex. App.—Houston [14th Dist.] 2010, no pet.). A trial judge may not even judicially notice testimony that was given at a temporary hearing in a family law case at a subsequent hearing in the same cause without admitting the prior testimony into evidence. *In re C.L.*, 304 S.W.3d 512, 515 (Tex. App.—Waco 2009, orig. proceeding) (quoting *Davis v. State*, 293 S.W.3d 794, 797–98 (Tex. App.—Waco 2009, no pet.)). "The trial judge's own memory of what the witness may have said at the prior proceeding is insufficient to substitute for an accurate and properly authenticated record of that testimony." *Id*. "A fact is not capable of accurate and ready confirmation simply because a trial judge remembers that a witness testified to it in trial." *Id.*

The record in this case does not affirmatively indicate that Respondent took judicial notice of the prior testimony at issue, nor was a transcript of any such testimony admitted into evidence. *See M.C.G.*, 329 S.W.3d at 675; *C.L.*, 304 S.W.3d at 515. To the extent that Respondent *did* consider the prior testimony in his determination of this matter, evidence that is the subject of improper judicial notice amounts to no evidence. *Guyton v. Monteau*, 332 S.W.3d 687, 693 (Tex. App.—Houston [14th Dist.] 2011, no pet.). If such improperly noticed evidence were part of the record before this Court, we would not consider it in conducting our analysis. However, the record indicates no transcript or recording exists of Respondent's interviews with A.O.'s children, obviating the need for us to disregard same.

### TEMPORARY ORDERS

12

Mother contends that Respondent abused his discretion by (1) failing to dismiss Grandmother's petition to modify for lack of standing, (2) violating her constitutional rights by appointing Grandmother as temporary managing conservator with the right to designate B.J.D.'s primary residence absent a finding that she is unfit, and (3) failing to dismiss Grandmother's grandparent access claims and giving Grandmother possession of and access to B.J.D. without requiring that she meet the statutory requirements for grandparent access.

**Standing**

A party seeking conservatorship of a child must have standing to do so. *In re McDaniel*, 408 S.W.3d 389, 396 (Tex. App.—Houston [1st Dist.] 2015, orig. proceeding). Because standing is implicit in the concept of subject matter jurisdiction, it is a threshold issue in a conservatorship proceeding, and a trial court should determine whether a party has standing before reaching the merits of the dispute. *In re N.L.D.*, 344 S.W.3d 33, 37 (Tex. App.— Texarkana 2011, no pet.); *In re SSJ-J*, 153 S.W.3d 132, 134 (Tex. App.—San Antonio 2004, no pet.). A party's lack of standing deprives the court of subject matter jurisdiction and renders a subsequent trial court action void. *In re Smith*, 260 S.W.3d 568, 572 (Tex. App.—Houston [14th Dist.] 2008, orig. proceeding). Dismissal is the appropriate disposition when a party lacks standing. *In re C.M.C.*, 192 S.W.3d 866, 870 (Tex. App.—Texarkana 2006) (orig. proceeding). When standing has been conferred by statute, the statute itself serves as the proper framework for a standing analysis. *In re K.D.H.*, 426 S.W.3d 879, 883 (Tex. App.—Houston [14th Dist.] 2014, orig. proceeding). Thus, the party seeking relief must allege and establish standing within the parameters of the language used in the relevant statute. *In re H.G.*, 267 S.W.3d 120, 124 (Tex. App.—San Antonio 2008, pet. denied).

In her petition to modify, Grandmother stated the following:

> Petitioner has standing to bring this suit because the child's present circumstances would significantly impair the child's physical health or emotional development as set forth in the attached Exhibits "A", "B", and "C" because the appointment of Respondents as sole managing conservators or both Respondents as joint managing conservators would significantly impair the child's physical health or emotional development. Additionally, Petitioner has standing to file this suit because Respondent, [Father], is in agreement with Petitioner filing this suit and in agreement with Petitioner's requests as set forth in his attached affidavit. Alternatively, Petitioner is requesting access to and/or possession of the child because she is the child's grandparent and denial of possession and/or access to the child would significantly impair the child's physical health or emotional well-being.

This language reflects reliance on Section 102.004 of the family code to establish standing.[5]

As pertinent to this case, a biological grandparent may request possession of or access to a grandchild by filing a suit for modification as provided by Chapter 156. TEX. FAM. CODE ANN. § 153.432(a) (West 2023). Chapter 156 provides that a person who, at the time of filing, has standing to sue under Chapter 102 may file a suit for modification in the court with continuing, exclusive jurisdiction. *Id*. § 156.002(a). Under Chapter 102, a grandparent may file an original suit requesting managing conservatorship if there is satisfactory proof to the court that: (1) the order requested is necessary because the child's present circumstances would significantly impair the child's physical health or emotional development; or (2) both parents, the surviving parent, or the managing conservator or custodian either filed the petition or consented to the suit. *Id*. § 102.004(a) (West 2023). Thus, if Grandmother established standing under Section 102.004(a), she could seek modification in the court of continuing exclusive jurisdiction. *See id*.

Grandmother cannot establish standing under Section 102.004(a)(2). "[W]hen both parents have been appointed joint managing conservators, the parent-managing conservators are collectively 'the managing conservator' and [] each of the parent-managing conservators must consent to the grandparents' intervention before the grandparents have standing under 102.004(a)(2) based on the consent of 'the managing conservator.'" *In re Lewis*, 357 S.W.3d 396, 402 (Tex. App.—Fort Worth 2011, orig. proceeding). Absent "consent from each managing conservator, the grandparents must have the consent of both parents or the child's surviving parent." *Id*. Because Grandmother had consent from only one managing conservator, Father, she cannot establish standing under Section 102.004(a)(2). *See id*.; *see also In re S.M.D.*, 329 S.W.3d 8, 14 (Tex. App.—San Antonio 2010, pet. dism'd).

With respect to Section 102.004(a)(1), Grandmother had the burden of providing satisfactory proof that the order requested is necessary because B.J.D.'s present circumstances would significantly impair her physical health or emotional development.[6] *See* TEX. FAM. CODE

---

[5] Mother also argues against standing under Section 102.003(a)(9). That Section provides, in pertinent part, that a person, other than a foster parent, who has had actual care, control, and possession of the child for at least six months ending not more than ninety days preceding the date of the filing of the petition may file an original suit. TEX. FAM. CODE ANN. § 102.003(a)(9) (West 2023). Grandmother did not allege having care, control, and possession of B.J.D. for at least six months; thus, she did not assert standing under Section 102.003(a)(9).

[6] For a finding of standing under Section 102.004(a)(1), "the evidence submitted regarding the standing issue, when considered in the light most favorable to the [Grandmother], must enable reasonable and fair-minded people to find that the order requested is necessary because the child's circumstances on the date suit was filed

ANN. § 102.004(a)(1). Likewise, the court may grant a grandparent deemed by the court to have had substantial past contact with the child leave to intervene in a pending suit filed by a person authorized to do so if there is satisfactory proof to the court that appointment of a parent as a sole managing conservator or both parents as joint managing conservators would significantly impair the child's physical health or emotional development. *Id*. 102.004(b). Here, Respondent found sufficient evidence to support both Grandmother's intervention and modification.[7]

"Satisfactory proof" is that "established by a preponderance of the evidence as the facts existed at the time the suit or intervention was filed." *Interest of K.J.,* 676 S.W.3d 186, 191 (Tex. App.—Tyler 2023, no pet.) (quoting *Rolle v. Hardy*, 527 S.W.3d 405, 417 (Tex. App.—Houston [1st Dist.] 2017, no pet.); *S.M.D.*, 329 S.W.3d at 13. To establish significant impairment, the nonparent must present evidence of the parent's specific actions or omissions that demonstrate an award of custody to the parent would result in the child's physical or emotional harm. *S.M.D.*, 329 S.W.3d at 6. Applicable factors include physical abuse, severe neglect, abandonment, drug or alcohol abuse, and immoral behavior by the parent. *Rolle*, 527 S.W.3d at 420. "Other considerations may include parental irresponsibility, a history of mental disorders and suicidal thoughts, frequent moves, bad judgment, child abandonment, and an unstable, disorganized, and chaotic lifestyle that has put and will continue to put the child at risk." *In Interest of S.T.*, 508 S.W.3d 482, 492 (Tex. App.—Fort Worth 2015, no pet.). The evidence must support a logical inference that the specific, identifiable behavior or conduct will probably result in the child being emotionally impaired or physically harmed. *S.M.D.*, 329 S.W.3d at 6. "The link between the parent's conduct and harm to the child may not be based on evidence that merely raises a surmise or speculation of possible harm." *S.T.*, 508 S.W.3d at 492-93. Section 102.004 "places a very heavy threshold burden on a grandparent seeking to intervene in a SAPCR." *Whitworth v. Whitworth*, 222 S.W.3d 616, 645 (Tex. App.—Houston [1st Dist.] 2007, no pet.) (op. on reh'g). A nonparent cannot meet this burden by evidence showing that she

---

would significantly impair the child's physical health or emotional development." *In re K.D.H.*, 426 S.W.3d 879, 889 (Tex. App.—Houston [14th Dist.] 2014, orig. proceeding).

[7] For this reason, we need not address Mother's complaint that Respondent abused his discretion by giving Grandmother possession and access without first requiring compliance with Sections 153.432 and 153.433 of the family code. *See* TEX. R. APP. P. 47.1. Respondent's order does not reflect a ruling on this basis and Mother acknowledges that Respondent "did not specifically address grandparent access under § 153.432 and 153.433 of the Texas Family Code in his ruling."

would be a better custodian of the child, has a strong and on-going relationship with the child, or the parent would not have been a proper custodian in the past. *Rolle*, 527 S.W.3d at 420.

The evidence before the trial court related to the alleged impairment generally focused on one certain "act" by Mother, namely her continued romantic relationship with A.O. Per Grandmother, B.J.D. said A.O. made her do "work outs" as punishment, only permitted her two meals per day, and instructed her to "hide" when visitors were present. Similarly, B.J.D. told Williams, the Department investigator, that she felt unsafe living with Mother and A.O., in part because A.O. disciplined her by making her exercise until she was exhausted. Other evidence related to A.O.'s actions or demeanor towards other people. D.O.'s affidavit stated that A.O. stalked her and threatened her life in front of their shared children, and Taylor testified that Mother said she was unenrolling B.J.D. from school because Mother was leaving a violent relationship. Outside of general allegations that A.O. is controlling and abusive, however, there was little evidence adduced regarding any specific actions by A.O. towards B.J.D. herself. *See In re J.W.*, No. 02-18-00419-CV, 2019 WL 2223216, at *4 (Tex. App.—Fort Worth May 23, 2019, orig. proceeding) (mem. op.) ("To establish 'significant impairment' of the children's physical health or emotional development, the movant must present evidence of bad acts or omissions committed against the children.") (quoting *In re Eddins*, No. 05-16-01451-CV, 2017 WL 2443138, at *4 (Tex. App.—Dallas June 5, 2017, orig. proceeding) (mem. op.)).

Further, the record contains only conjecture and conclusory statements as to the impact of B.J.D.'s circumstances on her physical and emotional health. B.J.D. related to Williams that she had sufficient food, clean clothes, and a place to sleep. None of the witnesses testified to seeing any occurrences or signs of physical abuse or neglect (other than Grandmother's statement about damage to B.J.D.'s hair), nor was there any evidence produced regarding acts of violence by A.O. toward Mother or B.J.D. (although B.J.D. mentioned Mother and A.O. verbally arguing in a different room). Moreover, Mother denied permitting A.O. to discipline B.J.D., and stated that he never "put his hand" on her or on B.J.D. Evidence of any existing or impending damage to B.J.D.'s emotional development is similarly lacking. A child displaying sadness (as testified to by L.V.) generally does not sufficiently demonstrate significant harm "when that sadness does not manifest as depression, behavioral problems, or acting out so as to rise to a level of significant emotional impairment." *See Int. of H.L.*, 613 S.W.3d 722, 725 (Tex. App.—Fort Worth 2020, no pet.) (citing *Derzapf*, 219 S.W.3d at 330, 333–34). Father testified that B.J.D. is

16

a generally "happy-go-lucky" child, without mentioning any recent changes in attitude, and Taylor stated that B.J.D. appeared happy and is "thriving" at school.

On this record, even viewing the available evidence in the light most favorable to Grandmother, we conclude that the trial court lacked evidentiary support for its finding of "significant impairment" to B.J.D. *See* TEX. FAM. CODE ANN. § 102.004(a). Consequently, the trial court abused its discretion by determining that Grandmother had standing to seek modification in the SAPCR pertaining to B.J.D.[8] *See* ***Derzapf***, 219 S.W.3d at 335.


### HABEAS CORPUS

We now address Mother's contention that Respondent abused his discretion by failing to rule on her application for writ of habeas corpus and presumptively denying her habeas application by awarding primary conservatorship to Grandmother.

A district court must hear an application for writ of habeas corpus concerning the proper legal custodian of a child and make its determination solely on the basis of who, at that time, has the legal right to custody. ***In re Guerrero***, 440 S.W.3d 917, 922 (Tex. App.—Amarillo 2014, orig. proceeding). Under Section 157.372(a) of the Texas Family Code, "if the right to possession of a child is governed by a court order, the court in a habeas corpus proceeding involving the right to possession of the child shall compel return of the child to the relator only if the court finds that the relator is entitled to possession under the order." TEX. FAM. CODE ANN. § 157.372(a) (West 2023). Section 157.372(a) requires the trial court to grant a writ of habeas corpus if it finds that a court order entitles the relator to possession. ***In re Bradshaw***, 273 S.W.3d 851, 855 (Tex. App.—Houston [14th Dist.] 2008, orig. proceeding). The issuance of the writ should be automatic, immediate, and ministerial. ***Greene v. Schuble***, 654 S.W.2d 436, 438 (Tex. 1983) (orig. proceeding). The trial court has no discretion to deny the writ and issue any other temporary order unless the party opposing the return of the child presents evidence raising "a serious immediate question concerning the welfare of the child." TEX. FAM. CODE ANN. § 157.374 (West 2023); ***In re Lau***, 89 S.W.3d 757, 759 (Tex. App.—Houston [1st Dist.] 2002, orig. proceeding). This requires proof of an imminent danger of physical or emotional harm to

---

[8] Because we find that Grandmother lacked standing, we need not reach Mother's issue regarding Respondent's appointment of Grandmother as temporary managing conservator without a finding that Grandmother overcame the constitutional fit parent presumption. *See* TEX. R. APP. P. 47.1.

the child, or, put another way, a "dire emergency." ***Guerrero***, 440 S.W.3d at 922-23 (citing ***In re deFilippi***, 235 S.W.3d 319, 322 (Tex. App.—San Antonio 2007, orig. proceeding) (per curiam). A trial court cannot grant or deny a writ of habeas corpus based on the best interest of the child. ***Bradshaw***, 273 S.W.3d at 859; ***deFilippi***, 235 S.W.3d at 322. If the court denies the return of the child to the relator, the court must make a written finding that there is a serious, immediate question concerning the child's welfare. ***Lau***, 89 S.W.3d at 759; ***M.R.J. v. Vick***, 753 S.W.2d 526, 528 (Tex. App.—Fort Worth 1988, orig. proceeding); ***In re Whatley***, No. 06-06-00035-CV, 2006 WL 870325 (Tex. App.—Texarkana 2006, orig. proceeding) (mem. op.). A trial court's order denying a writ of habeas corpus in a SAPCR is not an appealable order, so the erroneous denial of habeas corpus relief is an order from which there is no adequate remedy at law, and mandamus may lie to correct same. ***Guerrero***, 440 S.W.3d at 923 (citing ***Gray v. Rankin***, 594 S.W.2d 409, 409 (Tex. 1980) (per curiam)).

A copy of a Final Order Establishing the Parent-Child Relationship, signed December 5, 2014, is attached to Mother's habeas corpus application. The order designates Mother and Father as joint managing conservators and grants Mother the right to determine the primary residence of B.J.D. The order indicates that Father's right to possession of B.J.D. on weekends is to begin at 6:00 p.m. on Friday and end at 6:00 p.m. on Sunday, at which time Father will surrender B.J.D. to Mother.[9] Mother's supporting affidavit states that Father picked B.J.D. up from Mother's residence on Friday, January 20, 2023, and Father indicated that he would "let [Mother] know" what time he would return B.J.D. Father did not contact Mother, and when she contacted him on Sunday, Father responded that he would not be returning B.J.D. at all.

The record shows no finding by Respondent that Mother lacked a superior right of possession or of the existence of a serious and immediate question concerning B.J.D.'s welfare. On the contrary, at the time she filed the application, Mother established her entitlement to possession of B.J.D. under a court order in accordance with Section 157.372(a). *See* TEX. FAM. CODE ANN. § 157.372(a). Therefore, Respondent had no discretion to deny the writ unless an opposing party presented evidence that returning B.J.D. to Mother would cause "imminent danger of physical or emotional harm" to the child. *See id.* at § 157.374; ***Guerrero***, 440 S.W.3d

---

[9] The Final Order provides for a slightly different possession time if Father resides more than 100 miles from B.J.D.'s primary residence, but in both cases, Father's weekend possession is to terminate at 6:00 p.m. on either Sunday or the day before school resumes after the weekend.

at 922-23. Neither Grandmother nor Father responded to Mother's application for writ of habeas corpus to present any such evidence, and as aforementioned, Respondent did not hold a hearing on Mother's application.[10] Instead, Respondent denied relief in his January 27 email to counsel for the parties, stating, "Neither will the court expose a 9 year old child to the trauma of being collected by a police officer absent some clear showing of [imminent] danger." This statement does not comport with the findings required to confer Respondent with discretion to deny Mother's application. *See Bradshaw*, 273 S.W.3d at 855; *Lau*, 89 S.W.3d at 759. Even had Respondent made the requisite written finding of a serious and immediate question concerning B.J.D.'s welfare, there is no evidence of a "dire emergency" threatening B.J.D. physically or emotionally that would justify such a finding. *See deFilippi*, 235 S.W.3d at 322. In summary, the record established Mother's right to possession of B.J.D. and raised no serious, immediate question concerning her welfare in Mother's care. Accordingly, we conclude that Mother was entitled to immediate possession of B.J.D., her right to possession was enforceable by writ of habeas corpus, and it was an abuse of discretion for Respondent to deny same upon her application.[11] *See Guerrero*, 440 S.W.3d at 923.

## ATTORNEY'S FEES

The issue of attorney's fees is not listed in Mother's "Issues Presented," while the brief merely states, "Mother requests this Court order Respondent to … award Mother attorney's fees expended for having to fight for her constitutional rights against a nonparent in both the trial court and appellate court," and "[Mother] prays for attorney's fees to be awarded to Mother for the bringing of this suit." However, Mother cites no authority regarding attorney's fees, submits

---

[10] *See Young v. Martinez*, 685 S.W.2d 361, 363 (Tex. App.—San Antonio 1984, no pet.) ("Even if we assume in the instant case the trial court had sufficient evidence upon which to issue a temporary order for the immediate protection of the children involved, this court is disturbed by the lack of a meaningful hearing [on Mother's petition for writ of habeas corpus].").

[11] Mother requests that we determine whether the period in which Grandmother had care, custody, and control of B.J.D. under the erroneous temporary orders counts toward the time necessary to confer standing under Section 102.003. *See* TEX. FAM. CODE ANN. § 102.003(a)(9). However, we are not empowered to give advisory opinions, and this prohibition extends to unripe issues. *See Interest of C.R.D.*, No. 12-20-00143-CV, 2021 WL 3779224, at *11 (Tex. App.—Tyler Aug. 25, 2021, no pet.) (citing *Patterson v. Planned Parenthood of Houston & Se. Tex., Inc.*, 971 S.W.2d 439, 443 (Tex. 1998)). An issue is not ripe when its resolution depends on contingent or hypothetical facts, or upon events that have not yet come to pass. *Id.* Grandmother has not asserted standing under Section 102.003(a)(9); consequently, the issue is not ripe, and we cannot give an advisory opinion thereon.

no information regarding the amount or the reasonableness of the requested fees, and makes no argument as to the basis of the requested award.[12]

An appellate court has no duty to brief issues for an appellant. *Huey v. Huey*, 200 S.W.3d 851, 854 (Tex. App.—Dallas 2006, no pet.). The failure to provide appropriate record citations or a substantive analysis of the issues presented waives an appellate issue. *WorldPeace v. Comm'n for Lawyer Discipline*, 183 S.W.3d 451, 460 (Tex. App.—Houston [14th Dist.] 2005, pet. denied). Specifically, an appellant waives alleged error with regard to an award of attorney's fees when she fails to direct the court to authority on the issue. *See* TEX. R. APP. P. 38.1(i) (stating that the "brief must contain a clear and concise argument for contentions made with appropriate citations to authorities and to the record"); *see Interest of A.N.G.*, 631 S.W.3d 471, 478 (Tex. App.—El Paso 2021, no pet.) (father waived complaint regarding award of attorney's fees). Without more, this issue is inadequately briefed and presents nothing on which we could base a decision granting the relief requested. *See* TEX. R. APP. P. 38.1(i); *Palmer v. Off. of the Att'y Gen.*, 656 S.W.3d 640, 644 (Tex. App.—El Paso 2022, no pet.) (mentioning issue in passing insufficient to assign issue for appellate review); *Hall v. Hall*, No. 12-22-00086-CV, 2023 WL 2298753, at *6 (Tex. App.—Tyler Feb. 28, 2023, no pet.) (mem. op.).

## DISPOSITION

Having concluded that Respondent abused his discretion by determining that Grandmother had standing and subsequently entering the June 20, 2023, temporary orders, as well as by denying Mother's application for writ of habeas corpus, we ***conditionally grant*** Mother's petition for writ of mandamus.

We order Respondent to vacate his June 20, 2023, temporary orders and to dismiss the pleadings filed by Grandmother for lack of standing.

We further order Respondent to vacate his order denying Mother's application for writ of habeas corpus (insofar as such an order exists) and, in its stead, order that B.J.D. be immediately returned to the possession of Mother.

We trust Respondent will promptly comply with this opinion and order. The writ will issue only if the trial court fails to do so within ten days of the date of the opinion and order. The

---

[12] Neither party in a family law proceeding is entitled to an award of attorney's fees as a matter of right, and the trial court need not award attorney's fees at all. *See Banakar v. Krause*, 674 S.W.3d 564, 580 (Tex. App.—Houston [1st Dist.] 2023, no pet.).

20

trial court shall furnish this Court, within the time of compliance with this Court's opinion and order, a certified copy of the order evidencing such compliance.

**GREG NEELEY**
Justice

Opinion delivered January 24, 2024.
*Panel consisted of Worthen, C.J., Hoyle, J., and Neeley, J.*


**JANUARY 24, 2024**

**NO. 12-23-00256-CV**

**B. R.,**
Relator
V.

**HON. JUDGE B. JEFFREY DORAN,**
Respondent

---

### ORIGINAL PROCEEDING

ON THIS DAY came to be heard the petition for writ of mandamus filed by B.R.; who is the relator in appellate cause number 12-23-00256-CV and a party to trial court cause number 15372, pending on the docket of the County Court at Law of Anderson County, Texas. Said petition for writ of mandamus having been filed herein on October 2, 2023, and the same having been duly considered, because it is the opinion of this Court that the petition is well taken, it is therefore CONSIDERED, ADJUDGED and ORDERED that the said petition for writ of mandamus be, and the same is, hereby **conditionally granted**.

And because it is further the opinion of this Court that Respondent will act promptly and (1) vacate his June 20, 2023, temporary orders and dismiss the pleadings filed by J.P. for lack of standing, and (2) vacate his order denying B.R's application for writ of habeas corpus (insofar as such an order exists) and, in its stead, order that B.J.D. be immediately returned to B.R.'s

possession; the writ will not issue unless the HONORABLE B. JEFFREY DORAN fails to comply with this Court's order within ten (10) days from the date of this order.

By opinion.
*Panel consisted of Worthen, C.J., Hoyle, J. and Neeley, J.*