**In The**

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

**NO. 09-22-00380-CR**
_____

**JAMES JORDAN EARL, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from the 435th District Court**
**Montgomery County, Texas**
**Trial Cause No. 21-09-13141-CR**

**MEMORANDUM OPINION**

A grand jury indicted Appellant James Jordan Earl ("Appellant," "Defendant," or "Earl") for aggravated assault with a deadly weapon. *See* Tex. Penal Code Ann. § 22.02(a)(2). Earl pleaded "not guilty," but a jury found him guilty as charged and found that he used a deadly weapon in the commission of the crime. Pursuant to a plea agreement on punishment, the trial court sentenced Earl to eight years of confinement. In two issues, Earl appeals his conviction and challenges 1) the trial court's denial of his challenge to a juror, and 2) the denial of his motion for

1

mistrial which he made after objecting to a statement by the prosecutor during the State's closing argument. As explained below, we affirm.

Evidence at Trial

Testimony of "Sheldon"[1]

Sheldon, the complaining witness, described himself as 6'4" tall and weighing "just over 300 pounds[.]" He testified that, in the early morning of September 19, 2021, he was with his son, his girlfriend, and his girlfriend's daughter at the home of some friends in his neighborhood where they had been playing games. As the night was wrapping up, "Chet" was walking Sheldon and his family to their car, Chet noticed something "rowdy" happening down the road, and Chet decided he was going to see what was going on. Sheldon testified that he drove slowly behind Chet for support. According to Sheldon, he saw two men, one older than the other, they were yelling, one of the men was being "manhandled[,]" and "it looked like somebody needed help." At some point, Sheldon got out of the car and walked with Chet over toward where the two men were, and he saw Earl—who was the younger of the two men Sheldon had seen—"get kind of just handled and tossed, and his

---

[1] We use pseudonyms to refer to the victim and other witnesses who are not affiliated with law enforcement. *See* Tex. Const. art. I, § 30 (granting crime victims "the right to be treated with fairness and with respect for the victim's dignity and privacy throughout the criminal justice process").

things were being thrown out of the vehicle[.]" Sheldon described what he saw as "violent" and "angry" and the body language of the two men was "scary[.]"

Sheldon testified that he intended to help because it looked like Earl was in trouble. At some point, the older man drove away, and Earl was left alone at the side of the road. Sheldon testified that he thought about calling the police and mentioned that to Earl, but Sheldon's phone and his girlfriend's phone were dead, so he could not call. Sheldon testified that Earl "began to become upset and kind of belligerent[,]" and when Earl learned that the police were not called, he said, "Oh, you think I'm a criminal?" even though no one had said that. Sheldon described Earl's speech that night as "off[]" and "slurred[,]" and Sheldon wondered if Earl was okay.

After Chet and Earl exchanged words, Chet started to walk home, and Earl spoke to Chet in a raised voice and walked towards Chet. Sheldon testified, "I thought he was trying to pick a fight and hurt [Chet]." Sheldon then got between Chet and Earl, and he told Earl "sternly" to stop and go home. According to Sheldon, Earl explained that he was walking in the same direction as Chet because Earl or his friend lived in the area, but Sheldon did not believe him based on his demeanor and because Earl's belongings were in the middle of the street.

At that point, Sheldon had enough and yelled at Earl to take his things and leave them alone. Sheldon testified that Earl made "a sharp move[,]" Sheldon "felt

3

everything was threatened" because his family was nearby, and Sheldon "grabbed [Earl] and tossed him" over the curb. Sheldon also testified that he (Sheldon) did not have any weapons on him, and he did not make any threats. According to Sheldon, Earl "got up and pulled a gun from -- I don't even know where. It was so quick, and he shot me. He shot me in my forearm." Sheldon did not see what anybody else did after that, and he was afraid Earl was going to keep shooting. Sheldon identified the Defendant as the person who shot him that night. Sheldon explained that he had surgery to take the bullet out of his arm, and the injury affected his ability to work. Sheldon agreed that the photograph admitted as Defendant's Exhibit 2 is a photo of Earl that shows "an abrasion of some sort[]" on Earl's shoulder or collarbone.

Testimony of "Ariana"

Ariana testified that on the night of September 18-19, 2021, she went to a get-together at Chet and Aspen's home. When she was leaving with her daughter, Sheldon, and Joann, she saw a truck down the road with some "commotion going on[]" and people yelling. Ariana testified that she felt "a little uneasy," and as they got closer to the truck, there was more commotion, and Ariana decided to call 911, but everyone's phone was dead. Ariana testified that she and her daughter walked back to the house to call 911 from the house phone. According to Ariana, after calling 911, she went back to the street and saw the truck drive off, some belongings were lying on the side of the street, and there was a loud argument. Ariana described

4

Earl as "aggressive," and she could hear him yelling. Ariana saw Sheldon push Earl to the ground and she testified "that's when the gunfire went off." Ariana testified as follows:

> [State's counsel]: And what was [Sheldon] doing when the defendant shot him?
>
> [Ariana]: Just standing there.

Ariana testified that she did not see that Sheldon or Chet had a gun, knife, or any weapons. After she heard the gunshot, Ariana "took off running" because she did not want anyone else to get hurt. Ariana testified that when Sheldon pushed Earl, it was "kind of like a push[]" and was not "like it was a brawl[.]"

Ariana agreed that State's Exhibit 4 was an accurate recording of her conversation with the 911 operator from that night, and the exhibit was admitted into evidence and played for the jury. During the call, Ariana is heard telling the 911 operator there are "extremely irate" people in the neighborhood whom she did not know, the people were "screaming[,]" and Ariana requested police assistance to diffuse the situation. While on the call, Ariana reports that there was a gunshot and Sheldon was shot.

Testimony of "Aspen"

Aspen recalled that on September 18-19, 2021, her family was having a family game night at their house, as the party was winding down, her husband Chet walked Sheldon, Joann, Ariana, and their children outside. Aspen recalled that she soon

5

heard someone knocking at her front door, and she gave Ariana her phone to call 911. Aspen also testified that she went outside to get her husband to come home. Aspen recalled hearing "loud talking [and] irritated talking." She testified that she saw Earl, the Defendant, arguing with Chet. According to Aspen, Sheldon was "[j]ust standing, observing." Aspen testified that she approached Chet and told him to come home, and before starting to walk home, Chet told Earl "You are a clown. Get the 'F' out of here." Aspen recalled that Earl was agitated, angry and "fixated" on Chet, and Earl continued to talk to Chet as Chet was walking back home. Aspen testified that she saw Earl become aggressive and agitated with Chet, and she thought Earl was trying to get Chet to react because Chet's back was turned as he was walking home. Aspen recalled telling Earl to leave them alone, but Earl "darted across the walkway" to where Aspen and Chet were. Aspen testified that she saw Sheldon coming from the side to make sure everyone was okay. At some point, Aspen saw Sheldon "completely stop" the Defendant, and Chet was still walking home. Aspen testified that Sheldon said, "Leave us the 'F' alone. We are 'F'ing' done here." After making sure her husband was still heading home, she turned around and saw "the light from the gun[]" and she heard a gunshot. According to Aspen, when she turned around, she saw Sheldon holding his arm with blood pouring down his arm. Aspen recalled hearing Sheldon say, "Just stop[,]" and then he fell to the ground. Aspen testified that the Defendant was not as agitated after he

6

shot Sheldon. Aspen recalled that the police arrived a few minutes later, and she told the police, "He has a gun, and he shot my friend." Aspen testified that she did not hear Chet or Sheldon threaten the Defendant, nor did she hear any talk about guns, knives, or weapons. Aspen also testified that once Sheldon stepped between her and Chet and the Defendant, she felt "protected[.]"

Testimony of Deputy Zane Hoffmeyer

Zane Hoffmeyer testified that he is a Deputy for the Precinct 3 Constable's Office where he is a patrol deputy. Hoffmeyer testified that he was working the night shift of September 18-19, 2021, and he responded to a call of "a disturbance in progress." While he was on his way to the scene, the call was upgraded to "assault with a firearm in progress[,]" and when he arrived, he saw a man lying on the ground with a gun in his waistband. Hoffmeyer placed the man at gunpoint and detained him "due to him being the one with the weapon, everyone pointing at [him] saying, He shot him." According to Hoffmeyer, when he handcuffed the man, the man said something like "He touched me[.]" Hoffmeyer further testified that he removed the gun and set it to the side and placed the man in his patrol vehicle. Hoffmeyer testified that he tried to render aid to the victim and provided general security at the scene.

Hoffmeyer agreed he was wearing a body camera that night that captured a lot of the conversations that night, and his dashcam was also working that night. Hoffmeyer identified State's Exhibit 5 as a thumb drive with his body camera and

7

dashcam video from that night that had been muted in places due to hearsay statements. The body camera and dashcam videos were played for the jury. In the video, the Defendant is heard saying, "he touched me" and "I would never have done that, you [] grabbed me." The victim appears in the video to be lying on the ground in distress, as a police officer places a tourniquet on his arm.

While the videos were played for the jury, Hoffmeyer testified that the video shows "the victim lying on the ground and several people standing around him." Hoffmeyer testified that the Defendant "said something along the lines of being grabbed or touched." Hoffmeyer explained to the jury that he drove the Defendant to jail that night, and the Defendant did not appear to need any medical attention, but that Sheldon was taken to the hospital.

On cross-examination, Hoffmeyer confirmed that when he detained Earl and put him in the back of the patrol vehicle, Earl said that Sheldon had put his hands on Earl and that Sheldon "grabbed or touched[]" him. Hoffmeyer testified that he got brief statements from some other people at the scene, but he did not talk to Sheldon.

Testimony of Officer Shawn Gilbert

Shawn Gilbert testified that he was a police officer for the City of Humble at the time of trial, and he was previously a deputy for Precinct 3 Constable's Office in Montgomery County. Gilbert testified that, shortly after midnight on September 19, 2021, he was dispatched to a disturbance, and while on the way to the scene, he

8

learned that shots had been fired and someone was shot. Upon arrival, he picked up a firearm that Deputy Hoffmeyer had spotted, and Gilbert put the firearm in his patrol vehicle. Gilbert testified that he then helped another deputy apply a tourniquet to a man who was lying on the ground. Gilbert identified State's Exhibit 14 as the gun he collected at the scene, a Glock 17, 9mm, semiautomatic handgun.

On cross-examination, Gilbert identified Defense Exhibit 12 as a photograph he took of the Defendant with what he described as "an inside the pants holster for a handgun[]" and Gilbert stated that the Defendant still had the holster tucked into his waistband when Gilbert arrived. Gilbert agreed that this type of holster is "supposed to be kind of hidden on the body[.]" Officer Gilbert agreed that the Defendant asked him to take the photo admitted as Defense Exhibit 2, which shows an injury to the Defendant's shoulder.

Testimony of Detective Brad Kennelly

Brad Kennelly testified that he is a detective with the Montgomery County Precinct 3 Constable's Office, and he previously worked street patrol for about 8 years. He agreed he was on call in the early morning of September 19, 2021, when he received a call from a supervisor telling him to go to the scene of a shooting in Spring, Texas. Kennelly testified that, as lead detective, his duty at the scene was to try to determine what happened and to talk with the officers and other people who were at the scene. He interviewed witnesses, and his supervisor talked with the

9

victim at the hospital. He testified that his interviews were recorded. According to Kennelly, he later went to the hospital to get the bullet that was surgically removed from Sheldon's forearm so it could be entered into evidence.

Kennelly recalled that he talked with the Defendant for 30 to 45 minutes at the scene. According to Kennelly, the Defendant was slurring his words a little, and he contradicted himself a couple of times. Kennelly testified that the only injury he observed on the Defendant was an abrasion on his shoulder. Kennelly identified State's Exhibits 15, 33, and 34 as photographs of the Defendant's possessions lying on the ground at the scene. Kennelly also identified State's Exhibit 22 and 23 as photographs of a shell casing at the scene. Kennelly identified State's Exhibit 24 as a photograph of the Defendant on the night of the incident showing an abrasion on his shoulder area.

Testimony of the Defendant

After the State rested, the defense moved for a directed verdict, which the trial court denied. The Defendant testified that he lives with his father, and on the night of the incident, he was with his father, who was driving a pickup truck. According to Earl, his father's girlfriend was also riding in the truck, along with Earl's dog. Earl testified that they were going to a friend's house that night, but they ended up in a different neighborhood, and he realized they were lost. Earl recalled that he and

10

his father got into a heated argument, they were shouting at each other, and Earl decided he would rather walk than be in the truck.

Earl testified that after he got out of the truck with his dog, his father left, and Earl was alone with his dog and walking on the street. Earl noticed other people nearby who were yelling at him and his father, but he did not know who the people were. Earl testified that he was focused on Chet and Sheldon, and he was confused about why they were shouting at him. Earl recalled that he was "a little worried[,]" nervous, and uncomfortable because he was in an unfamiliar neighborhood and people were yelling at him, and he also began to shout. According to Earl, he did not use foul language or curse words. Earl testified that the people were yelling at him to go home.

Earl testified that he had a Glock 17 in a holster in his waistband. Earl did not know whether the other men had guns or weapons. He testified that when he tried to walk past one of the men, one of the men "shoved me on the ground, facedown." Earl agreed the man picked him up and threw him into the air, and he was injured when he landed on his shoulder blade. According to Earl, once he was able to stand up, that man was "coming at" him and reaching for Earl's gun because Earl had pulled the gun out to prevent the man from hurting him any further. Earl testified that the man was bigger than him, and when he saw the large man coming after him, he shot the man in the arm. Earl stated that he had learned "you should aim for center

11

mass, which is shoot to kill[,]" but he did not intend to kill the man he shot. Earl agreed that when he shot his weapon, he was worried for his life, and he did not think he had any alternatives to save himself from serious injury or death. Earl testified that after he shot his gun, he holstered the gun.

On cross-examination, Earl agreed that he shot Sheldon in the arm that night and that his gun is a deadly weapon. He testified that he could not call the police that night because his phone did not have network service. Earl also testified that Chet and Sheldon threatened him, but they did not say they had a gun or a knife. He agreed he told the police, "They touched me." The following exchange occurred on cross-examination:

> [State's counsel]: How come you didn't tell the officers [Sheldon] was reaching for your gun that night?
>
> [Earl]: I said he grabbed me. I was trying to explain that.
>
> [State's counsel]: You had your time to talk with the detective?
>
> [Earl]: Again, I thought I had, had this conversation with the detective.
>
> [State's counsel]: Okay. You didn't mention any of that, did you?
>
> [Earl]: Again, I don't recall.

After an opportunity for Earl to refresh his memory by watching Officer Hoffmeyer's videos, cross-examination continued:

> [State's counsel]: Okay. And you didn't tell the law [enforcement] officers that he grabbed you from the front and thr[ew] you. What did you say?

12

[Earl]: He grabbed me from behind.

[State's counsel]: And you didn't say he thr[ew] you 6 feet in the air, did you?

[Earl]: I didn't say that, no.

[State's counsel]: And you didn't say that [Sheldon] reached for your gun that night, did you?

[Earl]: I did not.

Earl testified that he became fearful of serious bodily injury or death after Sheldon threw him down in the road, and that was when he decided to pull out his gun to defend himself.

After Earl testified, the defense rested. After closing arguments, the jury found Earl guilty of aggravated assault with a deadly weapon as charged in the indictment. The trial court noted that the parties had agreed to a sentence of 8 years of confinement, the trial court accepted the agreement, and then assessed punishment at 8 years of confinement. Earl timely filed a Notice of Appeal.

Issues

Appellant raises two issues in this appeal. In his first issue, Appellant argues that the trial court erred by denying his challenge for cause of a potential juror who could not consider the full range of punishment. In his second issue, Appellant argues that the trial court erred by denying his motion for mistrial where the prosecutor made a "burden shifting argument" during closing argument.

13

Challenge to Potential Juror

In issue one, Earl complains that the trial court erred by denying his challenge for cause to potential juror No. 34 ("No. 34") "because Juror No. 34 could not consider the full range of punishment." The State argues that Earl failed to establish the trial court's denial of his challenge for cause was harmful because he did not use a peremptory strike on the complained-of juror or request an additional strike.

On the first day of voir dire, the parties were unable to select a panel of twelve jurors, so the trial court dismissed the panel and reconvened two days later with a new panel. During the second day of voir dire with the new panel, defense counsel raised the issue of punishment and stated, "[t]he range of punishment in this case [] is anywhere between 2 and 20 years in prison, or, in the appropriate circumstance, between 2 and 10 years of probation." Defense counsel then asked the panel whether they could consider probation for someone convicted of aggravated assault. No. 34 was among those who indicated they could not consider probation. The trial court then restated the question as follows:

> . . . Can you imagine a set of facts or a scenario -- because you don't know anything about this case -- can you imagine a hypothetical case, in your mind, that would allow you to walk into the jury room and consider the entire range of punishment and determine the appropriate punishment from that? That is the question. It is completely unfair for you to be asked on this case because you don't know anything. So, can you [imagine] a case, a set of facts in your head, that you could consider -- not give, consider the entire range of punishment?

According to the record, No. 34 did not say anything in response, but on the record the defense attorney states that some members of the panel, including No. 34, responded by indicating they could not consider the full range of punishment, from probation up to 20 years. The trial court stated, "[t]his is cannot imagine a scenario or case in which you could consider the full range of punishment, that being, consider probation up to 20 years." No. 34 indicated they could not.

Later, at a bench conference, the trial court questioned jurors No. 34 and No. 35 about whether they could consider the full range of punishment, including probation.

> THE COURT: 34 and 35, there were some questioning, I believe, by both sides and the Court, originally, specifically as to the range of punishment, that the range was 2 years up to 20 years incarceration, and then upon jury recommendation, if the sentence was ten or under -- they came back with a number of nine TDCJ -- that they could recommend probation. If the defendant is eligible for probation, there's certain things that were proven or shown. So, that probation would come from the jury. What the instructions -- I'm going to send instructions back with into jury room when they are deliberating on punishment, and the instructions will tell you that you must not fix punishment by lot or chance. You must give meaningful consideration to the full range of punishment, and you do that based solely on determining the evidence that you heard both in the guilt/not guilty phase and in the punishment phase of the trial. You base your decision on everything you hear.
>
> I certainly don't have a way to tell you what you are going to hear because I haven't heard anything either. So, it would be unfair to ask, What are you going to do for punishment? because you don't have any information. The law requires that you -- when you take your oath, that you say, Yes, I will go back to that jury room. I will give consideration to the full range of punishment based on what I hear in the courtroom

on the case. So, you are not -- you are not prejudging the case. Does that make sense?

VENIREPERSON:[2] Uh-huh.

THE COURT: With that in mind, are you able to do that and able to follow the law that's -- that will be given to you and say, Yes, I will wait. I will listen. I will hear the evidence. I will observe the evidence. I will walk into the jury room able to give meaningful consideration to the full range of punishment and deliberate on that?

VENIREPERSON: For me, my answer is, Yes. The reason why my answer may be wishy-washy is the wording. Yes, I will follow the law, but can I imagine a scenario where a person found guilty of this could get probation? I can't imagine that scenario, but will I follow the law, yes.

THE COURT: Thank you.

[Defense counsel]: I have another objection for 34 on the Fifth Amendment issue. So, we talked about the Fifth Amendment and his right not to testify, and I think you stated that you would require him to testify.

VENIREPERSON: Yes. I will follow the law, and I will not -- I think I can follow the law and not hold that against him. It's hard to imagine a scenario where the State proves somebody has shot another person and is claiming -- is saying that it was aggravated assault with a deadly weapon -- it's hard to imagine a scenario where they have proven that you have shot somebody, and he won't defend himself. If they haven't proven their case beyond a reasonable doubt, I will follow the law, but it's hard to imagine that scenario.

THE COURT: If the law says you shall not consider it or hold it against Mr. Earl if he chooses to exercise his right not to testify, you are telling the Court you can do that?

---

2 The reporter's record in this section references only "VENIREPERSON" and it does not indicate whether the response was made by No. 34 or No. 35, or both.

VENIREPERSON: I can do that.

THE COURT: And you will do it?
VENIREPERSON: Uh-huh.

THE COURT: Are you able to consider the full range of punishment while deliberating on that issue?

VENIREPERSON: That's provided that if he's found guilty -- if he's found --

VENIREPERSON: Consider it, yes, but I don't think probation, if he's guilty of assault with a deadly weapon -- I would not --

THE COURT: I believe the way it's worded in the Court's instructions is give meaningful consideration and -- not to make light of it, but it's like if you are going to help your neighbor with their clogged toilet. They are asking for your help, right?

They are asking for meaningful consideration. The Court is asking for meaningful consideration because this is a big deal. This is a big deal. So, if you can tell me that you are going to go into the deliberation room, and you are going to listen, observe, hear everything that occurs in the courtroom and that you are going to walk into that room and give the full range of punishment meaning full[] consideration as our law requires and as Mr. Earl is deserving of, then I need to know if you are able to do that. If you are not, there's no shame in that.

VENIREPERSON: I would really have a hard time with the probation part. I have been trying to think of a scenario like he was commenting about, and I would have a hard time. Two years for something -- the time frame of incarceration, absolutely, but just probation, I would have a hard time with that.

THE COURT: Did you understand the probation only comes if recommended by the entire jury? Did you understand that?

VENIREPERSON: I would assume it would be a consensus.

THE COURT: Anything further?

17

[State's counsel]: Not from the State.

[Defense counsel]: No.

(Perspective jurors exit the bench.)

The defense attorney then told the trial court that he did not consider No. 34 "sufficiently rehabilitated[.]" The trial court denied the challenge and stated, "34 stays." The record reflects that the defense attorney did not exercise a peremptory strike on Juror 34, and the defense attorney did not ask the trial court for an additional strike. That said, the record shows that when the State submitted its challenges, the State struck No. 34, and the jury that was seated on the case did not include Juror No. 34.

Generally, a potential juror may be challenged for cause if the member has expressed a bias or prejudice against the defendant or the law on which the State or the defendant is entitled to rely. *Hudson v. State*, 620 S.W.3d 726, 731 (Tex. Crim. App. 2021) (citing Tex. Code Crim. Proc. Ann. art. 35.16(a)(9), (b)(3), (c)(2); *Gardner v. State*, 306 S.W.3d 274, 295 (Tex. Crim. App. 2009)). That said, to preserve error on a trial court's erroneous denial of a challenge for cause, an appellant must show that he asserted a clear and specific challenge for cause, that he used a peremptory challenge on the complained-of potential juror, that his peremptory challenges were exhausted, that his request for additional strikes was denied, and that an objectionable juror sat on the jury. *See Davis v. State*, 329 S.W.3d

798, 807 (Tex. Crim. App. 2010); *Cobbs v. State*, No. 09-21-00380-CR, 2023 Tex. App. LEXIS 2479, at *20 (Tex. App.—Beaumont Apr. 19, 2023, pet. ref'd) (mem. op., not designated for publication); *Andrus v. State*, 495 S.W.3d 300, 307 (Tex. App.—Beaumont 2016, no pet.). Here, Appellant did not use a peremptory challenge on the complained-of potential juror, he did not establish that his peremptory challenges were exhausted, or that his request for additional strikes was denied, nor did the objectionable juror sit on the jury. Additionally, as stated above, the record indicates that Juror No. 34 did not serve on the jury at trial. Therefore, Appellant has failed to preserve error on this issue, and there is nothing for this Court to review. *See Davis*, 329 S.W.3d at 807; *Cobbs*, 2023 Tex. App. LEXIS 2479, at *20; *Andrus*, 495 S.W.3d at 307. We overrule Appellant's first issue.

## Motion for Mistrial

In his second issue, Earl complains that the trial court erred when it denied his motion for mistrial after the prosecutor allegedly "made a burden shifting argument in closing argument[.]" During the State's closing argument, the prosecutor mentioned that the defense had talked about the timeline of events on the night of the incident, and the State argued that the victim "didn't have time to coordinate a story with anybody[]" because he was at the hospital. The defense objected that the prosecutor was testifying to facts not in evidence, and the trial court overruled that

19

objection. The State continued with its argument and the following exchange then occurred:

> [State's counsel]: Don't you know if there was something material that would be affecting this case, that if [Sheldon, the victim] said something that conflicted or inconsistencies, Defense would have brought that to your attention?
>
> [Defense counsel]: Objection; burden shifting. Objection; testifying about facts not in evidence. This is the State's case, and the State controls the evidence. They didn't offer it. My objection is --
>
> THE COURT: Your objection as to statements not in evidence is overruled.
> Your objection as to -- I believe, it was burden shifting. I will sustain that and caution Counsel to restrict to his closing arguments, please.
>
> [Defense counsel]: I would ask to -- I guess move to strike that from the record, and I would make a motion for mistrial on those statements.
>
> THE COURT: Asking the jury to disregard the last comment made by [State's counsel] in his reference to evidence that would have been shown by the Defense.
> Your motion for mistrial is denied.
> Proceed.
>
> [State's counsel]: The State is fully prepared to take the burden beyond a reasonable doubt. The burden is still on the State at all times. . . .

We review the trial court's ruling on an objection to allegedly improper jury argument for an abuse of discretion. *See Garcia v. State*, 126 S.W.3d 921, 924 (Tex. Crim. App. 2004). "[P]roper jury argument generally falls within one of four general areas: (1) summation of the evidence; (2) reasonable deduction from the evidence; (3) answer to argument of opposing counsel; and (4) plea for law enforcement."

20

*Brown v. State*, 270 S.W.3d 564, 570 (Tex. Crim. App. 2008). "To constitute reversible error, the argument must be manifestly improper or inject new, harmful facts into the case." *Jackson v. State*, 17 S.W.3d 664, 673 (Tex. Crim. App. 2000).

When the trial court sustains an objection and instructs the jury to disregard but denies a defendant's motion for mistrial, the issue is whether the trial court abused its discretion by denying the mistrial. *Archie v. State*, 340 S.W.3d 734, 738-39 (Tex. Crim. App. 2011) (citing *Hawkins v. State*, 135 S.W.3d 72, 77 (Tex. Crim. App. 2004)); *Webb v. State*, 232 S.W.3d 109, 112 (Tex. Crim. App. 2007). An appellate court views the evidence in the light most favorable to the trial court's ruling, considering only those arguments before the trial court at the time of its ruling. *Ocon v. State*, 284 S.W.3d 880, 884 (Tex. Crim. App. 2009) (citing *Wead v. State*, 129 S.W.3d 126, 129 (Tex. Crim. App. 2004)). The ruling must be upheld if it was within the zone of reasonable disagreement. *Id.* Only in extreme circumstances where the prejudice is incurable is a mistrial required. *Hawkins*, 135 S.W.3d at 77; *Ocon*, 284 S.W.3d at 884-85 (mistrial should be granted when less drastic alternatives fail to cure prejudice). When evaluating whether a trial court abused its discretion by denying a defendant's request for a mistrial based on an improper jury argument, appellate courts balance several factors adopted in *Mosley v. State*, including (1) the severity of the misconduct (the magnitude of the prejudicial effect of the prosecutor's remarks), (2) the measures adopted to cure the

misconduct (the efficacy of any cautionary instruction by the judge), and (3) the certainty of conviction absent the misconduct (the strength of the evidence supporting the conviction). *Archie*, 340 S.W.3d at 739 (citing *Mosley v. State*, 983 S.W.2d 249 (Tex. Crim. App. 1998)). The Appellant does not address the *Mosley* factors in his appellate brief, and the State addresses the factors without calling them "*Mosley* factors," and cites to *Archie v. State*, which discussed the *Mosley* factors.

In this case, the trial court overruled the defense's objection to comments on evidence outside the record, but it sustained the objection as to "burden shifting." We have previously noted that "[o]ur courts have consistently held that the State may argue in its closing argument that the defendant failed to present evidence in his favor." *Trevino v. State*, 474 S.W.3d 737, 749 (Tex. App.—Beaumont 2014, pet. ref'd).[3] The State contends that under *Trevino*, the prosecutor's complained of

---

[3] Citing to *Bible v. State*, 162 S.W.3d 234, 249 (Tex. Crim. App. 2005) (stating that State may comment on defendant's failure to call certain witnesses and such comment is not impermissible attempt to shift burden of proof); *Jackson v. State*, 17 S.W.3d 664, 674 (Tex. Crim. App. 2000) (prosecutor's reference during closing argument to defendant's failure to produce expert testimony was not improper because the remark did not fault the defendant for exercising his right not to testify); *Patrick v. State*, 906 S.W.2d 481, 491 (Tex. Crim. App. 1995) (holding that a prosecutor's comment is not improper if it "can reasonably be construed to refer to appellant's failure to produce evidence other than his own testimony"); *Rodgers v. State*, 486 S.W.2d 794, 797 (Tex. Crim. App. 1972) (explaining that a prosecutor may comment on the accused's failure to call a witness absent a showing that the witness was incompetent or that the accused could not, despite his exercise of due diligence, secure the witness's attendance at the trial); *Baines v. State*, 401 S.W.3d 104, 107-08 (Tex. App.—Houston [14th Dist.] 2011, no pet.) (holding that a prosecutor's comment on the defense's failure to subpoena two witnesses was not

22

remark was not improper. *See id.* We agree. That said, here the trial court sustained the Defendant's objection that the comment was "burden shifting" and then refused to grant a mistrial, and the trial court gave the jury an instruction to disregard the comments. As explained below, after applying the *Mosley* factors, we find the arguments made by the Appellant lack merit, and the trial court did not abuse its discretion by denying the motion for mistrial. *See Archie*, 340 S.W.3d at 739 (citing *Mosley*, 983 S.W.2d 249).

We address the first two *Mosley* factors together—the magnitude of the prejudicial effect of the prosecutor's remarks and the measures adopted to cure the alleged misconduct. According to Appellant, the prosecutor's complained-of remark improperly shifted the burden of proof to the defense and "'undermined the presumption of innocence.'"[4] Here, even assuming without deciding that the prosecutor's remark improperly shifted the burden of proof, the trial court instructed the jury to disregard the remark. "The law generally presumes that instructions to disregard and other cautionary instructions will be duly obeyed by the jury." *Archie*,

---

error); *Caron v. State*, 162 S.W.3d 614, 618 (Tex. App.—Houston [14th Dist.] 2005, no pet.) (noting that "[d]uring jury argument, the State may comment on appellant's failure to present evidence in his favor"); *Lee v. State*, 21 S.W.3d 532, 544 (Tex. App.—Tyler 2000, pet. ref'd) (prosecutor's comment on the accused's failure to call the doctor that the accused told a witness he had taken the victim to see was not improper jury argument).

[4] Citing to *Abbott v. State*, 196 S.W.3d 334, 343 (Tex. App.—Waco 2006, pet. ref'd).

23

340 S.W.3d at 741; *see also Adams v. State*, 156 S.W.3d 152, 157 (Tex. App.—

Beaumont 2005, no pet.) ("In most instances, the trial court's instruction to disregard

cures any harm."). Additionally, immediately after the trial court gave the instruction

to disregard, the prosecutor stated, "The State is fully prepared to take the burden

beyond a reasonable doubt. The burden is still on the State at all times." During voir

dire, both the State and the defense told the potential jurors that the State had the

burden of proof. During opening arguments, the defense told the jury that the State

had the burden of proof. The jury charge also included the following instructions:

> Presumption of Innocence
> The Defendant is presumed innocent of the charge. All persons
> are presumed to be innocent, and no person may be convicted of an
> offense unless each element of the offense is proven beyond a
> reasonable doubt. The fact that a person had been arrested, confined, or
> indicted for, or otherwise charged with, the offense gives rise to no
> inference of guilt at his trial. The law does not require a Defendant to
> prove his or her innocence or produce any evidence at all. Unless the
> jurors are satisfied beyond a reasonable doubt of the Defendant's guilt
> after careful and impartial consideration of all the evidence in the case,
> the presumption of innocence alone is sufficient to acquit the
> Defendant.
>
> Burden of Proof
> The burden of proof throughout the trial is always on the State.
> The Defendant does not have the burden to prove anything. The State
> must prove every element of the offense beyond a reasonable doubt to
> establish guilt for the offense. The State does not need to prove these
> things beyond all possible doubt; it is only required to present proof that
> excludes all reasonable doubt.
> If the state does not prove every element of the offense beyond a
> reasonable doubt, or if you have a reasonable doubt about whether the
> Defendant is guilty after considering the evidence and these
> instructions, you must find the Defendant not guilty.

On this record, we conclude that the prosecutor's complained-of remark had little, if any, prejudicial effect, and that the measures taken to cure any prejudice were adequate to cure any harm. Therefore, we resolve the first and second *Mosley* factors against the Appellant. *See Archie*, 340 S.W.3d at 740-41.

Finally, we examine the record to determine the certainty of conviction absent the alleged misconduct. *See Archie*, 340 S.W.3d at 739. The jury heard Sheldon testify that he heard Earl in a loud disagreement with someone, he told Earl to go home, and when Sheldon felt threatened by Earl's behavior, he grabbed Earl and tossed him. The jury also heard Sheldon testify that Earl then pulled out a gun and shot Sheldon in the arm. The jury heard Ariana testify that she heard gunfire after she saw Sheldon push Earl to the ground, and that when Earl shot Sheldon, Sheldon was "[j]ust standing there." The jury heard testimony from Deputy Hoffmeyer that upon arriving at the scene of the shooting, Earl said something like, "He touched me[.]" Hoffmeyer also testified that other people at the scene pointed at Earl and said, "He shot him." The jury saw Hoffmeyer's body camera video that shows Earl saying, "He touched me" and shows the victim lying on the ground in distress while officers treat his gunshot wound. The jury heard Detective Kennelly testify that the only injury he observed on Earl was an abrasion on his shoulder. The jury saw photos admitted into evidence that show an abrasion to Earl's shoulder. The jury also heard Earl testify that he feared serious bodily injury or death after Sheldon threw him

25

down and that was when Earl decided to pull out his gun to defend himself. The jury is the sole judge of the credibility and weight of the witnesses' testimony, and the jury could have believed all, some, or none of the testimony from Earl, and the other witnesses. *See Metcalf v. State*, 597 S.W.3d 847, 855 (Tex. Crim. App. 2020).

On this record, we find the evidence to support the conviction to be strong, and we conclude that the jury likely would have convicted Appellant regardless of the prosecutor's statement in closing which appellant claims was an improper burden shifting comment. *See Archie*, 340 S.W.3d at 742; *Trevino*, 474 S.W.3d at 749. We conclude that the trial court did not abuse its discretion by denying the motion for mistrial, and we overrule Appellant's second issue. *See Archie*, 340 S.W.3d at 742; *Mosley*, 983 S.W.2d at 259-60.

Having overruled both of Appellant's issues, we affirm the trial court's judgment.

AFFIRMED.

LEANNE JOHNSON
Justice

Submitted on January 5, 2024
Opinion Delivered February 14, 2024
Do Not Publish

Before Horton, Johnson and Wright, JJ.